(No. 73240.—Judgment reversed; cause remanded.)

# THE PEOPLE OF THE STATE OF ILLINOIS, Appellee, v. MICHAEL A. BLACKWELL, Appellant.

*Opinion filed April 18, 1996.*

MILLER, J., joined by BILANDIC, C.J., dissenting.

Charles M. Schiedel, Deputy Defender, and John J.

Hanlon, Assistant Defender, of the Office of the State Appellate Defender, of Springfield, for appellant.

James E. Ryan, Attorney General, of Springfield, and James W. Glasgow, State's Attorney, of Joliet (Barbara A. Preiner, Solicitor General, and Arleen C. Anderson and Penelope Moutoussamy George, Assistant Attorneys General, of Chicago, of counsel), for the People.

JUSTICE NICKELS delivered the opinion of the court:

After a jury trial in Will County, defendant was convicted of three counts of first degree murder (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(a)(2)), one count of aggravated battery with a firearm (Ill. Rev. Stat. 1989, ch. 38, par. 12—4.2), and one count of reckless conduct (Ill. Rev. Stat. 1989, ch. 38, par. 12—5). Defendant waived his right to be sentenced by a jury, and the trial judge found defendant eligible for the death penalty (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(b)(3)). After considering factors in aggravation and in mitigation, the trial judge sentenced defendant to death (Ill. Rev. Stat. 1989, ch. 38, par. 9—1(h)). Defendant appealed directly to this court. Ill. Const. 1970, art. VI, § 4(b); Ill. Rev. Stat. 1989, ch. 38, par. 9—1(i); 134 Ill. 2d R. 603.

While defendant's appeal was pending in this court, the Supreme Court announced its decision in *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 128 L. Ed. 2d 89, 114 S. Ct. 1419 (1994). In *J.E.B.*, the Court held that peremptory challenges cannot be used to discriminate on the basis of gender during jury selection. On appeal, defendant argued, *inter alia*, that the State had exercised its peremptory challenges in violation of *J.E.B.* This court found that defendant had established a *prima facie* case of gender discrimination (*People v. Blackwell*, 164 Ill. 2d 67 (1995)) and remanded the cause to the circuit

court for a hearing to give the State the opportunity to present reasons for its use of peremptory challenges. After a hearing, the circuit court found that the explanations advanced by the State for its use of peremptory challenges were gender neutral. Defendant again appeals to this court, challenging the trial court's ruling that the State's explanations were gender neutral.

## FACTS

Testimony at trial revealed the following. Defendant grew up in Joliet but later moved to Mississippi. On October 18, 1990, defendant was in Joliet visiting his friend Virgil Jones. On the evening of October 18, Jones suggested to defendant that they visit a friend of Jones who lived in a nearby apartment. Jones and defendant drove to this apartment, and defendant was introduced to four individuals, one of whom was Steve Scott. Defendant brought a semiautomatic handgun with him, concealed in the waistband of his trousers.

One of defendant's new acquaintances suggested that the group attend a party in another apartment in the building. At this time, unknown to defendant, four members of the Latin Kings gang were present at the party. Shortly after defendant and his acquaintances arrived at the small studio apartment, a fight started between Steve Scott and the Latin Kings. Defendant then pulled out his handgun and fired at Scott's attackers. Three Latin Kings (Desiderio Martinez, Robert "Jimmy" Gonzalez, and John Garcia) were killed and another (David Lopez) was wounded. A fifth individual (Wendy Magee), who had accompanied defendant to the apartment and was not involved in the fight, was also wounded. The police later arrested defendant near Jones' apartment.

Eight witnesses, including defendant, testified regarding the specific details of the shooting. Several witnesses testified that the Latin Kings confronted Scott,

"flashed" gang signs at him, and accused him of being a member of the "Two-Sixers" gang. The Latin Kings and the Two-Sixers were rival gangs in Joliet. At some point, one of the Latin Kings removed his own shirt, banged his own head against a wall, and said that he had just been released from prison. Scott told the Latin Kings that he was no longer a member of the Two-Sixers, but the Latin Kings blocked him into a corner of the apartment. Soon afterwards, the Latin Kings started pushing and grappling with Scott.

After the fight started, Scott managed to push his way to the door of the apartment and leave. The fight lasted about 15 seconds. The last time Scott saw the four Latin Kings they were facing toward the door and away from defendant. Before the shooting, no one threatened defendant or "flashed" gang signs at him. Scott's attackers did not draw any weapons, and Scott's only injury was a bump behind his ear. Several witnesses stated that the fight did not seem serious. Scott, however, testified that he was afraid that one of his attackers had a concealed weapon and would use it against him.

As Scott was leaving, defendant removed his weapon and fired one shot into the group that had attacked Scott. The four attackers started to turn towards defendant. Defendant then fired numerous shots at the victims. Defendant fired a total of 14 times in the span of 10 to 15 seconds at Scott's attackers. Some witnesses testified that one of the victims was shot after he had fallen to the ground. Witnesses also testified that a second victim was shot in the back of the head as he was fleeing. A third victim was shot five times, once when he was lying on the floor and kicking the door to the apartment as defendant was leaving.

Defendant testified at trial. Defendant stated that he brought a handgun with him to Joliet because he

knew of the gang violence there. Defendant testified that his brother was killed by the Latin Kings in 1986 and that he and his family were harassed by the Latin Kings after his brother's shooting. For this reason, defendant and his family moved to Mississippi.

With respect to the shooting, defendant essentially testified that he panicked. Defendant stated that, after firing an initial shot, he fired rapidly into the mass of individuals in front of him. Defendant testified that, after the fight started, he was afraid that he might have to fight next. In addition, defendant thought that the victims might have weapons with them. The police later recovered a knife from the pockets of one of the victims. Defendant also believed that Scott's life was in danger when the Latin Kings were attacking Scott. According to defendant, he felt that the only way he could get out of the apartment was by shooting. After defendant was arrested, he gave the police a statement similar to this testimony.

## JURY SELECTION

During jury selection, the State exercised 15 of 17 peremptory challenges to exclude women from the venire, four of whom were black. Defendant argued that the State was racially discriminating in violation of *Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986). At a *Batson* hearing during *voir dire*, Assistant State's Attorney Thomas discussed the State's general strategy.

While seeking to show that the State was not discriminating on the basis of race, Thomas specifically noted that the State had used its 17 peremptory challenges to exclude 15 women from the jury. Thomas suggested that the State was excluding potential jurors on the basis of gender. Thomas then stated that he excluded the women because he was concerned about potential sympathy for defendant's mother. Thomas later reiter-

ated this concern when discussing specific reasons for dismissing one of the prospective jurors. The jury was ultimately composed of five women and seven men. As stated, after the United States Supreme Court announced its decision in *J.E.B.*, the cause was remanded by this court to the circuit court for a hearing to determine if the State had discriminated on the basis of gender.

At the remand hearing, the circuit court listened to the reasons offered by the State for each of its peremptory challenges. The State's reasons were offered by former Assistant State's Attorney Tomczak, who was one of the prosecutors at defendant's trial. Tomczak was not the prosecutor who had made the statements at the original *Batson* hearing. The State did not offer any explanations from Thomas, the prosecutor who had made the statements regarding gender.

Tomczak had possession of the notes taken during jury selection. He used these notes, as well as the transcript, to refresh his memory. Tomczak stated that this case was his first death penalty case and he therefore remembered it reasonably well. At the remand hearing, Tomczak introduced a second general strategy used by the State that was not presented at the original *Batson* hearing. He stated that, in his experience, jurors fall into two categories: "proactive" and "reactive." Proactive jurors are leaders and good communicators. They are more aggressive. Tomczak stated that he did not want too many proactive jurors on the jury because that would increase the possibility of a hung jury. Tomczak then went into specific detail about the reasons for excluding each woman from the venire. After hearing the State's reasons, the circuit court found that these reasons were gender neutral.

## ANALYSIS
Defendant has raised several arguments on appeal.

Based on our disposition of this case, we address only three issues: (1) whether the State discriminated on the basis of gender during jury selection; (2) whether the evidence was sufficient to support the first degree murder convictions; and (3) whether the imposition of the death penalty was excessive in this case. For the reasons discussed below, we reverse and remand for a new trial.

I

In *J.E.B.*, the Supreme Court held that the use of peremptory challenges to discriminate on the basis of gender violates the equal protection clause. The Court stated that gender discrimination perpetuates misguided stereotypes about the relative abilities of men and women. *J.E.B.*, 511 U.S. at 131, 128 L. Ed. 2d at 98, 114 S. Ct. at 1422. The Court also emphasized that gender discrimination harms the litigants, the community, and prospective jurors who have been excluded. *J.E.B.*, 511 U.S. at 140, 128 L. Ed. 2d at 104, 114 S. Ct. at 1427. In reaching its holding in *J.E.B.*, the Court extended its decision in *Batson*, where the Court had prohibited racial discrimination during jury selection.

Accordingly, we apply the *Batson* approach in the context of gender discrimination. First, a defendant must make a *prima facie* showing that the State has exercised peremptory challenges on the basis of gender. Second, if the trial court concludes that a defendant has made a *prima facie* showing, the burden shifts to the State to give gender-neutral explanations for dismissing the potential jurors. Finally, the trial court decides whether defendant has carried his burden of proving purposeful discrimination. See *Hernandez v. New York*, 500 U.S. 352, 359, 114 L. Ed. 2d 395, 405, 111 S. Ct. 1859, 1866 (1991).

In this case, we must determine whether the State has rebutted the *prima facie* showing of gender discrimination. The State's explanations for its peremptory chal-

lenges must be " 'clear and reasonably specific' " and "related to the particular case to be tried." *Batson*, 476 U.S. at 98 & n.20, 90 L. Ed. 2d at 88 & n.20, 106 S. Ct. at 1724 & n.20, quoting *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 258, 67 L. Ed. 2d 207, 218, 101 S. Ct. 1089, 1096 (1981). The State may not rebut a defendant's *prima facie* showing by stating that it excused members of the venire in the belief that they would be sympathetic toward defendant because of their shared gender. See *Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723. Exclusion of even one potential juror on the basis of gender requires reversal. See *People v. Harris*, 129 Ill. 2d 123, 175 (1989).

We note, however, that each of the State's explanations for its peremptory challenges need not justify a challenge for cause (*Batson*, 476 U.S. at 97, 90 L. Ed. 2d at 88, 106 S. Ct. at 1723), and will be considered gender neutral "[u]nless a discriminatory intent is inherent in the prosecutor's explanation" (see *Hernandez*, 500 U.S. at 360, 114 L. Ed. 2d at 406, 111 S. Ct. at 1866). In addition, the prosecutors who exercised the peremptory challenges are not required to testify under oath and are not subject to cross-examination regarding the reasons for the peremptory challenges. *People v. Young*, 128 Ill. 2d 1, 24-25 (1989); see also *Harris*, 129 Ill. 2d at 174. The trial judge's determination is a finding of fact which necessarily involves an evaluation of credibility and will not be reversed unless it is clearly erroneous. *Hernandez*, 500 U.S. at 369, 114 L. Ed. 2d at 412, 111 S. Ct. at 1871. Our review in this regard is deferential to the trial judge's determination.

We now consider the specific explanations given by the State. As part of his general strategy, Tomczak stated on remand, he wanted to limit the number of proactive jurors on the jury. He specifically applied this explanation to four of the women excused from the ve-

nire. One of the women, Barbara Bonow, was a customer service representative. Tomczak stated that she was a good communicator. Louise Kujath was proactive because she answered questions aggressively. Susan Ward was a salesperson, Sunday school teacher, and a good communicator. She had been on a jury twice before.

The fourth proactive individual was Irene Kasbee. At the remand hearing, Tomczak stated that Kasbee was a real estate broker and had held positions of authority. Tomczak also stated that Kasbee was a good communicator and had engaged in narratives when answering the trial judge's questions during *voir dire.*

These statements are incorrect. Kasbee was not employed as a real estate broker: she was a secretary for a life insurance company. In addition, the record does not show any other positions that she may have held in the past. The record also does not support Tomczak's statement that Kasbee gave narrative answers to the trial judge's questions during *voir dire.*

We further note that the State's professed proactive strategy, if applied consistently, is a gender-neutral strategy. In this case, however, this proactive explanation was applied only to women. Several of the seven male venire members who were accepted on the jury exhibited characteristics that would also seem proactive. Daniel Foote was a school administrator; Michael Musser was a project engineer; Thomas McQuillan was a marketing coordinator; Kevin Pullara was a department manager for a store and the coach of several sports teams; and Ronald Bass was an organization effectiveness specialist for Xerox. Many of these male jurors were in positions of authority or positions requiring good communication skills. In addition, no reference to this proactive strategy was contained in the prosecutors' notes of jury selection. The State's application of this reason to the male jurors and the stricken women appears inconsistent.

We also note that four of the women stricken from the jury (Erika Baillie-David, Lavergne Rechkemer, Louise Kujath, and Helen Smit) were either victims of crime or had close acquaintances who were victims of crime. Tomczak stated that they may have been disgruntled with the system. Three of the seated male jurors (Daniel Foote, Stanley Rousonelos, and Ronald Bass) had also been crime victims or had close acquaintances who had been crime victims. The State's application of this reason appears inconsistent.

In its brief to this court, the State further indicated that seven female potential jurors (Marguerite Shambo, Barbara Bonow, Louise Kujath, Irene Kasbee, Susan Ward, Tonya Meza, and Ceretha Young) were challenged because they showed possible antagonism to the death penalty. The record shows that only Shambo and Young suggested that each might be concerned about imposing the death penalty. The remaining potential jurors made no such statements. Furthermore, Tomczak did not suggest, at the remand hearing, that he excused these remaining jurors because of antagonism to the death penalty. Although the State acknowledges that these remaining potential jurors never explicitly articulated a concern with the death penalty, it notes that Tomczak simply felt uncomfortable with them. This explanation is vague and appears pretextual.

With respect to the last two women stricken (Tonya Meza and Renee Brigham), Tomczak stated that they were removed to assure the presence of a later, more desirable juror. Specifically, Tomczak based these strikes on the actions of defense counsel Jaquays:

"Mr. Jaquays—I have a clear recollection of this—at some point in time had used his final challenge. It was, very frankly, Judge, surprising to me because I did not know the death penalty laws and the *Batson* laws as clearly as I should have at the time. I was surprised that Mr. Jaquays had used his last challenge. I clearly remember as he used

his last challenge, there were, there was a juror who was third down the line that I had a very, very strong feeling about. I believe now, having reviewed the notes, his name was Foote. I—and this was my actions—I suggested to Mr. Thomas that we utilize our peremptory challenges to put that individual on the jury. And there was no other consideration as to the two final challenges that we used to get to Mr. Foote other than simply to get to him."

Tomczak later corrected himself, noting that the last potential juror, whom he wanted on the jury, was named Bass, not Foote.

Tomczak stated that he based his strikes on defense counsel's use of all peremptory challenges before reaching Tonya Meza and Renee Brigham. Indeed, Tomczak stated that "there was no other consideration as to the final two challenges." This stated consideration, however, is false. The record shows that defendant had several peremptory challenges remaining when Meza and Brigham were considered. Defendant still had four peremptory challenges remaining when the State removed Brigham. Defendant had two peremptory challenges remaining when the State removed Meza. In fact, after the jury was selected, the trial judge stated, and Tomczak agreed, that defendant still had one peremptory challenge remaining, which would be applied to the selection of alternate jurors. Thus, this reason for eliminating Meza and Brigham is not supported by the record.

In response to these concerns, the State correctly notes that peremptory challenges are often used to remove individuals from the venire based on a combination of characteristics. *People v. Andrews*, 155 Ill. 2d 286, 295 (1993); *Young*, 128 Ill. 2d at 23-24. Thus, the State may exclude a woman for one reason and, at the same time, accept a similarly situated man, based on other reasons. The man may have exhibited other gender-neutral traits that the State found desirable. See

*Andrews*, 155 Ill. 2d at 295. As this court has stated, however, the repeated use of vague, mistaken, and inconsistent explanations suggests that the State's reasons are pretextual. *People v. Hope*, 147 Ill. 2d 315 (1992). The State's reasons appear pretextual.

In addition to providing specific reasons for striking each individual juror, the State seeks to explain the statements made by former Assistant State's Attorney Thomas at the original *Batson* hearing. At the hearing, Thomas discussed the State's general strategy to show that it was not discriminating on the basis of race:

"MR. THOMAS: Another thing that I would point out is as a matter of trial strategy. I deliberately did not ask the court to ask the jurors any questions about their feelings towards firearms, nor did I ask the court to ask them any questions about their feelings towards gangs. I think that to do that unnecessarily highlights those two things, puts it in their mind that they ought to be concerned about gangs and guns. And I deliberately didn't do that because I think I have a pretty good idea at this time having prosecuted cases in this county for 12 years and having lived here all my life, which areas are subject to gang infestation and which aren't.

I would also like to point out to the court that my counting of peremptory shows that the prosecution exercised two peremptories as to males and 15 as to females.

\* \* \*

The prosecution, according to my count, exercised two peremptory challenges as to males and 15 as to females. Conversely, the defense exercised eight as to females and 12 as to males.

Another concern that myself and Mr. Tomczak had coming into this case was the concern about the sympathy factor when the jurors are confronted with the testimony of the defendant's mother. I would again point out to the court that based on my experience in trying jury cases, even in cases where I felt I had a lock solid case, I've seen juries stay out for hours and hours having felt sympathy for one or both parents of the defendant when they testi-

fied. That kind of thing happens, and it's something to take into consideration."

After stating this general strategy, Thomas discussed some specific reasons for eliminating certain potential jurors. When discussing reasons for dismissing Darlene McGee, Thomas stated: "And again, I pointed out to the court I felt that I had to consider in my jury selection anyone that might feel sympathetic towards the defendant's mother."

The State has offered several explanations for these statements. On appeal, the State argues that Thomas was merely commenting on how the State's challenges had disproportionately affected women. According to the State, Thomas was noting the disproportionate impact of the State's strikes on women. In addition, at the remand hearing, the State asserted that Thomas' comments applied only to Darlene McGee and were not intended to apply to all potential jurors.

The record does not support these arguments. At the *Batson* hearing, Thomas was presenting the general strategy that he used throughout jury selection. Thomas first stated that he did not want to emphasize gangs and guns to the potential jurors. He then called the court's attention to the disproportionate number of women struck by the State and his concern for sympathy to defendant's mother. Thomas was suggesting that the State was eliminating potential jurors on the basis of gender, not race. At this stage, Thomas would have no reason to make any reference to the gender of those individuals removed by the State except to suggest gender as part of his nonracial basis for the challenges.

Alternatively, at the remand hearing, the State argued that Thomas was concerned about possible sympathy for either of defendant's parents, not just his mother. The State contended that it removed potential jurors based on their status as parents. Removal of individuals based on their status as parents would rep-

resent a gender-neutral strategy. See *Robertson v. Commonwealth*, 18 Va. App. 496, 445 S.E.2d 713 (1994) (finding no discrimination where the State used its peremptory challenges to eliminate those individuals who were not parents).

We reject this argument. Nothing in the record suggests that the State consistently struck men and women based on their status as parents. In fact, the record shows otherwise. Thomas specifically applied his sympathy concern to Darlene McGee, even though McGee did not indicate that she had any children. Accordingly, Thomas' statements suggest that he was striking McGee because she and defendant's mother were both women. Given this fact, Thomas' statements cannot be construed as a gender-neutral strategy of striking potential jurors based on their status as parents.

In this respect, this case is similar to *J.E.B.* In *J.E.B.*, the underlying action was a paternity action. The State used all of its peremptory challenges to strike men from the jury, arguing that men might feel sympathy for the purported father involved in the paternity action. The Court rejected the argument " 'that men otherwise totally qualified to serve upon a jury might be more sympathetic and receptive to the arguments of a man alleged in a paternity action to be the father of an out-of-wedlock child, while women equally qualified to serve upon a jury might be more sympathetic and receptive to the arguments of the complaining witness who bore the child.' [Citation.]" *J.E.B.*, 511 U.S. at 137-38, 128 L. Ed. 2d at 102, 114 S. Ct. at 1426. In this case, Thomas' statements with respect to Darlene McGee imply that she was removed because she might feel sympathy due to her shared gender with defendant's mother.

The State has offered no plausible explanation for Thomas' statements. See *Cleveland v. State*, 318 Ark. 738, 888 S.W.2d 629 (1994) (finding that the prosecution

had failed to rebut the *prima facie* showing of purposeful discrimination where the prosecution used 90% of its peremptory challenges to remove women and where the prosecution explained its challenges by suggesting that the defendant was removing men). The prosecutor's own statements must be considered the best indicator of intent. The fact that several women ultimately served on the jury is not determinative of this intent. See *Abshire v. State*, 642 So. 2d 542 (Fla. 1994) (finding that the prosecutor's statements showed that he was purposefully discriminating against women even though several women served as jurors).

We find the trial judge's determination to be clearly erroneous based on two factors: the State's reasons given at the remand hearing and Thomas' statements at the original *Batson* hearing. First, the State's reasons for using 15 of 17 peremptory challenges to remove women were repeatedly vague, mistaken, and inconsistent. They are pretextual. *People v. McDonald*, 125 Ill. 2d 182, 198-201 (1988); *People v. Hope*, 147 Ill. 2d 315, 321-22 (1992). Second, and more significant, one of the prosecutors himself made statements indicating that potential jurors were excluded on the basis of gender and the State has failed to explain these statements in a gender-neutral manner. Accordingly, given these factors, we must reverse defendant's convictions. *McDonald*, 125 Ill. 2d at 200-01.

## II

Defendant also argues that his first degree murder convictions should be reduced to second degree murder. Essentially, defendant argues that the evidence presented at trial was sufficient to support second degree murder convictions only, not first degree. If defendant is correct, the State cannot seek first degree murder convictions on retrial because of principles of double jeopardy. See *Burks v. United States*, 437 U.S. 1, 11, 57

L. Ed. 2d 1, 9, 98 S. Ct. 2141, 2147 (1978); *McDonald*, 125 Ill. 2d at 201; *People v. Taylor*, 76 Ill. 2d 289, 309 (1979).

The second degree murder statute provides:

"(a) A person commits the offense of second degree murder when he commits the offense of first degree murder *** and either of the following mitigating factors are present:

(1) At the time of the killing he is acting under a sudden and intense passion resulting from serious provocation by the individual killed or another whom the offender endeavors to kill ***; or

(2) At the time of the killing he believes the circumstances to be such that, if they existed, would justify or exonerate the killing under the principles stated in Article 7 of this Code [self-defense or defense of others], but his belief is unreasonable." Ill. Rev. Stat. 1989, ch. 38, par. 9—2(a).

Defendant concedes that the State established the elements needed to prove first degree murder. Under the statute, defendant must prove one of the two mitigating factors by a preponderance of the evidence to reduce the offenses to second degree murder. Ill. Rev. Stat. 1989, ch. 38, par. 9—2(c); see also *People v. Jeffries*, 164 Ill. 2d 104 (1995). Defendant argues that he proved both mitigating factors.

We note that defendant's challenge to the sufficiency of the evidence is unusual. Ordinarily, a defendant challenges the sufficiency of the evidence presented by the *State*. In that instance, the standard of review is " 'whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' " (Emphasis in original.) *People v. Collins*, 106 Ill. 2d 237, 261 (1985), quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 61 L. Ed. 2d 560, 573, 99 S. Ct. 2781, 2789 (1979); see also *People v. Ward*, 154 Ill. 2d 272, 314 (1992). In this instance, however, de-

fendant argues that *he* presented sufficient evidence to prove one of the mitigating factors. In this context, we consider whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found that the mitigating factors were not present.

Defendant first argues that he proved that his actions resulted from serious provocation by the Latin Kings gang members. To constitute serious provocation, however, a defendant must show that the provocation fits within certain recognized categories. A defendant may be seriously provoked by "substantial physical injury or substantial physical assault, mutual quarrel or combat, illegal arrest, and adultery with the offender's spouse." *People v. Garcia*, 165 Ill. 2d 409, 429 (1995). None of these categories apply here.

Defendant argues that the actions of the Latin Kings constituted mutual combat. Mere words and gestures, however, are not enough to constitute serious provocation. *Garcia*, 165 Ill. 2d at 429-30; *People v. Tenner*, 157 Ill. 2d 341, 371-72 (1993). In this case, none of the conduct of the Latin Kings was directed at defendant before the shooting. Even if words or gestures were sufficient to constitute serious provocation, the testimony shows that none of the victims "flashed" gang signs at defendant, threatened defendant, or talked to defendant.

Defendant next argues that the shooting resulted from an unreasonable belief in the need for self-defense or defense of others. Defendant testified that he became fearful when the Latin Kings started fighting with Scott because he thought this was an altercation between rival gangs. In addition, defendant stated that he had first hand knowledge of the Latin Kings' predisposition for violence because his brother had been killed by this gang. See *People v. Reeves*, 47 Ill. App. 3d 406, 411-12

(1977) (the defendant's knowledge of deceased's ability to inflict great bodily harm based on past experience supported claim of self-defense). Defendant testified that the shooting occurred over a short time interval, which was not enough time for him to realize that more shooting was unnecessary. See, *e.g.*, *People v. Shipp*, 52 Ill. App. 3d 470, 476-77 (1977) (involving claim of self-defense).

We reject this argument. Although defendant presented some evidence that would support an unreasonable belief in self-defense or defense of others, other evidence presented at trial does not support this mitigating factor. The evidence showed that defendant went to a party carrying a concealed and loaded semiautomatic handgun. The fight between Scott and the victims was a fist fight and did not involve weapons. Scott was attacked for 15 seconds and was making his way to the door to escape when the shooting started. The only injury sustained by Scott was a bump behind his ear. Several witnesses testified that the fight between Scott and the Latin Kings was not serious.

Defendant fired his weapon 14 times as Scott was escaping, and during a time when the victims were facing away from defendant. No threats or hostile gestures had been made towards defendant. In addition, one of the victims was shot in the back of the head as that individual was running away from defendant. The State also presented evidence that two of the victims were shot again after they fell to the floor.

In reaching this conclusion, we do not mean to suggest that we have made a finding regarding defendant's guilt that would be binding on retrial. *McDonald*, 125 Ill. 2d at 202. We conclude, for double jeopardy purposes only, that the evidence presented at the first trial was sufficient to support first degree murder convictions. The State may therefore pursue first degree murder charges on retrial.

III

Defendant further argues that the sentence of death in this case was excessive. We consider defendant's argument because of the possibility of double jeopardy. Although double jeopardy ordinarily does not apply to sentencing proceedings, the Supreme Court has held that principles of double jeopardy do extend to capital sentencing proceedings. *Bullington v. Missouri*, 451 U.S. 430, 68 L. Ed. 2d 270, 101 S. Ct. 1852 (1981). This court has stated that our capital sentencing proceeding is basically " 'a trial on the issue of punishment' " and implicates double jeopardy concerns. *People v. Davis*, 112 Ill. 2d 78, 82 (1986), quoting *Bullington*, 451 U.S. at 438, 68 L. Ed. 2d at 279, 101 S. Ct. at 1858; see also *People v. Levin*, 157 Ill. 2d 138 (1993); *People v. Page*, 155 Ill. 2d 232 (1993). The State may not seek the death penalty again at retrial if the sentencer or the reviewing court determines that death has not been established as the appropriate punishment at the first trial. *Poland v. Arizona*, 476 U.S. 147, 154-55, 90 L. Ed. 2d 123, 131-32, 106 S. Ct. 1749, 1755 (1986); *Bullington*, 451 U.S. at 443, 68 L. Ed. 2d at 282, 101 S. Ct. at 1860.

In Illinois, capital sentencing consists of two stages: an eligibility phase and an aggravation/mitigation phase. Defendant's challenge is directed only to the second phase. In this case, the trial judge evaluated aggravating and mitigating factors at the second phase and determined that there were no mitigating factors "sufficient to preclude the imposition of the death sentence." See Ill. Rev. Stat. 1989, ch. 38, par. 9—1(h).

Generally, this court will not interfere with a trial court's determination of sentence unless the trial court has abused its discretion. See, *e.g.*, *People v. Gonzalez*, 151 Ill. 2d 79, 89 (1992); *People v. Illgen*, 145 Ill. 2d 353, 379 (1991). This court, however, has noted that "[t]here is a qualitative difference between death and imprisonment as penalties." *People v. Gleckler*, 82 Ill. 2d 145, 161

(1980). In reviewing the death penalty, we consider the "character and record of the individual offender and the circumstances of the particular offense." *Woodson v. North Carolina*, 428 U.S. 280, 304, 49 L. Ed. 2d 944, 961, 96 S. Ct. 2978, 2991 (1976). We therefore give less deference to the trial court here than we would in other sentencing matters.

During sentencing, the State relied on the evidence presented at trial for its factors in aggravation. Defendant then presented the live testimony of nine mitigation witnesses. Friends and relatives testified that defendant had provided emotional and economic support for his family throughout his life. In addition, they stated that he was an attentive and responsible parent to his daughter. Three prison officials testified favorably about defendant's conduct in prison. A clinical psychologist also testified that defendant has an anxiety disorder and is prone to anxiety attacks.

One of the mitigation witnesses was David Randall, a mitigation specialist who prepared a sentencing memorandum. According to Randall, defendant had a difficult background because of his parents' mixed-race marriage, his father's alcoholism, the family's financial troubles, and the near-in-time deaths of his father, brother, and grandmother. Despite these troubles, defendant consistently avoided becoming involved with gangs when growing up in Joliet. Supervisors from previous jobs described defendant as reliable and hard working. Defendant was also involved in ROTC and served in the Army Reserve for two years. Defendant completed basic training and was honorably discharged. Although defendant left high school before graduation, he later obtained his GED.

Defendant notes that, at the time of the shooting, he had no criminal record and no past history of violence. The lack of a significant criminal history is a statutory

mitigating factor. Ill. Rev. Stat. 1989, ch. 38, par. 9—1(c)(1). Defendant also argues that the circumstances surrounding his conduct were threatening and that he felt panicked in the apartment. Defendant was particularly afraid of the Latin Kings because of his brother's murder. Although these circumstances may not have been sufficient to reduce defendant's convictions for first degree murder, defendant argues that these circumstances should have been taken into account at sentencing. Defendant notes that extreme mental or emotional disturbance is another statutory mitigating factor. Ill. Rev. Stat. 1989, ch. 38, par. 9—1(c)(2).

We consider previous cases where this court has found a death sentence to be excessive. In *People v. Carlson*, 79 Ill. 2d 564 (1980), the defendant murdered his former wife and a police officer. The defendant and his wife had been married for 19 years and had divorced three months before the murders. The defendant hoped to reconcile with his former wife but learned that his former wife had a boyfriend. The defendant then shot his former wife 10 times and used gasoline to set the house on fire. When police tried to arrest him, the defendant shot and killed one of the officers. In reducing the defendant's sentence to natural life imprisonment, this court emphasized that the defendant had no prior criminal record, that this was an isolated incident, and that the defendant had suffered severe physical and emotional problems before the shootings.

In *People v. Buggs*, 112 Ill. 2d 284 (1986), the defendant set fire to his home after an argument with his wife. The defendant's wife told him that she had been unfaithful during the marriage and that he was not the father of two of "their" children. The defendant then poured gasoline on his wife and throughout the home. The defendant's wife and one of the children died during the ensuing fire.

In reducing the sentence, this court noted that the defendant had been drinking heavily during the month of the incident and had a history of drinking problems, including blackouts. The defendant had also served in the military for 21 years. The defendant had no history of serious criminal activity, and this event was an isolated incident. A psychiatrist for the defense testified that the defendant suffered from isolated explosive disorder at the time of the offenses.

In *People v. Johnson*, 128 Ill. 2d 253 (1989), the defendant was responsible for killing one individual and seriously wounding two others. The defendant had been fired from his job but was informed that he had a final paycheck. The defendant returned to his former work place but was told that there was no final paycheck for him. The defendant shot his former supervisor twice. The supervisor had earlier fired him. The defendant also shot one of his former co-workers twice, and this co-worker later died. The defendant then had a third victim lie on the floor, shot him twice, and stabbed him. The defendant also took some money from the victims.

This court reduced the defendant's sentence, noting that the defendant had no significant criminal history. The defendant had no history of violence and had not been involved with gangs. In addition, the evidence showed that defendant suffered severe emotional distress from the loss of his job and failure to receive a promised check.

We find that the mitigating factors in this case are comparable to those emphasized in the cases cited by defendant. At sentencing, defendant presented substantial mitigating evidence. As in the cases discussed above, defendant had no criminal record, and this event was an isolated incident. The testimony presented at trial and sentencing showed that defendant had not been involved with gangs and had no history of prior violence.

In addition, the testimony does not suggest that the shooting was planned in any way. Defendant returned to Joliet for a brief visit and had not planned to attend the apartment party. *Cf. People v. Gosier*, 145 Ill. 2d 127 (1991) (upholding death sentence even though the defendant did not have a criminal record, where the evidence showed that the defendant planned his crimes).

Defendant was present in an apartment when a fight started involving gang members. Defendant did not know that gang members would be present in the apartment. While we do not minimize the seriousness of defendant's actions, "defendant has led a relatively blameless life except for this one explosive episode." *Johnson*, 128 Ill. 2d at 282. The legislature did not intend that every defendant who qualifies for the death penalty receive the death sentence. *Johnson*, 128 Ill. 2d at 277. After reviewing the record, we conclude that the death sentence was excessive in this case.

## CONCLUSION

We find that the State has failed to rebut the *prima facie* showing of gender discrimination. Accordingly, we must remand this matter for a new trial. In addition, we find that the sentence of death in this case was excessive. Based on double jeopardy, the State may not pursue the death penalty at retrial. We recognize that defendant has raised other issues supporting a new trial. Because we have determined that defendant is entitled to a new trial in any event, we do not address them. For the foregoing reasons, the judgment of the circuit court is reversed and the cause is remanded for a new trial.

*Judgment reversed;*
*cause remanded.*

JUSTICE MILLER, dissenting:

I continue to believe that the defendant has waived any contention that the jury in the present case was

selected in violation of the rule announced in *J.E.B. v. Alabama ex rel. T.B.*, 511 U.S. 127, 128 L. Ed. 2d 89, 114 S. Ct. 1419 (1994). In a prior opinion, a majority of this court determined that the defendant had established a *prima facie* case of sex discrimination in the selection of his jury, and the court remanded the cause so that the prosecution would have the opportunity to advance neutral reasons for its challenges to the jurors in question. *People v. Blackwell*, 164 Ill. 2d 67 (1995). As I noted at that time, the majority was ignoring the rule we have previously enforced requiring that a defendant make a proper, timely objection to the jury selection procedures employed at trial. Until the decision in this case, our decisions had clearly and consistently held that a defendant's failure to raise a *Batson*-type claim (*Batson v. Kentucky*, 476 U.S. 79, 90 L. Ed. 2d 69, 106 S. Ct. 1712 (1986)) in the trial court would result in the waiver of that contention. *People v. Fair*, 159 Ill. 2d 51, 71 (1994); *People v. Evans*, 125 Ill. 2d 50, 61-62 (1988).

*People v. Pecor*, 153 Ill. 2d 109 (1992), is instructive. The defendant in that case argued at trial that the jury was being selected in violation of *Batson*. The trial judge rejected the defendant's contention, believing that the defendant, who was white, lacked standing to challenge the exclusion of black members of the venire. While the defendant's appeal was pending, the United States Supreme Court decided *Powers v. Ohio*, 499 U.S. 400, 113 L. Ed. 2d 411, 111 S. Ct. 1364 (1991), which eliminated any requirement that the defendant and the excluded venire members be of the same racial group. From a review of the record, the *Pecor* court concluded that the defendant had adequately preserved an objection to the prosecution's alleged exclusion of black members of the venire. Responding to the State's concern that a decision in favor of the defendant in that case would mean that any defendant would be allowed

to raise a similar challenge to the selection of his jury, no matter how untimely the objection, this court counseled that "defendants who made no objection whatsoever cannot now simply create claims and go back to the trial court and attempt to prove a *prima facie* case of discrimination." *Pecor*, 153 Ill. 2d at 126.

Despite our admonition in *Pecor*, that is exactly what the present defendant has been allowed to do. At trial in the present case, the defendant did not object to the prosecutor's exercise of peremptory challenges against female members of the venire. The only *Batson*-type claim raised by the defense involved the State's alleged exclusion of several black potential jurors on the basis of race. Nonetheless, the majority has resolved to address the merits of the defendant's belated contention that the prosecution improperly challenged female members of the venire. The majority's decision to entertain the defendant's tardy claim placed the State in the unenviable position of attempting to reconstruct, long after the fact, the particular reasons that led the prosecution team to prefer one prospective juror over another. The majority notes a number of discrepancies between the State's explanations for its exclusion of certain jurors and the record from the original proceedings; the variances exemplify the difficulties in determining, at this late date, the reasons that motivated the prosecution's exercise of its peremptory challenges when the strikes are attacked on a ground wholly different from the one asserted by the defendant at trial.

Because I believe that the defendant has waived any challenge to the State's alleged exclusion of women from the jury, I would consider in this appeal the defendant's remaining allegations of error in the guilt-innocence phase of the proceedings.

CHIEF JUSTICE BILANDIC joins in this dissent.