NOTICE

Decision filed 03/30/26. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2026 IL App (5th) 250438-U

NO. 5-25-0438

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

NOTICE

This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 22-CF-517 |
| | ) | |
| DAURICE T. MORSE, | ) | Honorable |
| | ) | Ralph R. Bloodworth III, |
| Defendant-Appellant. | ) | Judge, presiding. |

JUSTICE McHANEY delivered the judgment of the court.
Presiding Justice Cates and Justice Hackett concurred in the judgment.

**ORDER**

¶ 1  *Held*:  The evidence was sufficient to prove the defendant guilty of first degree murder beyond a reasonable doubt and to disprove the mitigating factor of unreasonable belief in self-defense. The defendant's 65-year sentence was not excessive where the trial court properly considered the statutory factors in aggravation and mitigation and imposed a sentence within the statutory range.

¶ 2  I. BACKGROUND

¶ 3  The defendant, Daurice T. Morse, was charged by indictment with first degree murder in that on October 23, 2022, he "killed Jacob Gary, without lawful justification," by "[shooting] Jacob C. Gary with a firearm" or, alternatively, "shot Jacob C. Gary with a firearm, knowing such acts created a strong probability of death or great bodily harm *** causing the death of Jacob C. Gary." 720 ILCS 5/9-1(a)(1), (a)(2) (West 2022). The defendant elected to have a bench trial, which commenced on February 4, 2025.

1

¶ 4    At trial, officers testified that on the night of October 23, 2022, they were patrolling a popular area called "The Strip" in Carbondale, Illinois, which was crowded that night, because an early Halloween celebration was taking place. At 1:30 a.m., a large group of people started running, and officers then heard gunshots. Officers saw Jacob Gary (Gary) on the ground in the parking lot of Artistic Mind Tattoos with a gunshot wound to his back. They administered CPR, but Gary was nonresponsive; he was taken to the hospital, where he was pronounced deceased a half an hour later. Two 9-millimeter cartridge casings were found near Gary's body.

¶ 5    Forensic pathologist Christopher Kiefer testified that he performed the autopsy of Gary on October 25, 2022. Gary's primary injury was a gunshot wound in the middle of his back that exited his body in the chest. The cause of death was that same gunshot wound.

¶ 6    Officers recovered surveillance footage from city pole cameras and several businesses in the area. Forensic digital examiner Aaron Baril spliced the videos together to show the crowded street at the time of the incident. The spliced video showed the crowd running on The Strip. Footage from Artistic Mind tattoo shop and the city pole cameras showed an individual, who was initially identified by the nickname "Metro," chasing Gary. The footage showed Metro firing a gun, with his left hand, and then showed Gary on the ground. The video showed Metro firing a second time. The surveillance footage did not show what caused the crowd to begin running.

¶ 7    Two officers, Corporal Shaleah Howard and Sergeant Brandon Sternau, testified that they were able to identify Metro as the defendant from the surveillance footage. Howard testified that she used to work at the Cairo Police Department, that the defendant was her neighbor, and that he was in a rap group that posted videos online. The Carbondale Police Department contacted her and asked if she could identify the person in the surveillance videos known as Metro. She viewed the

footage and identified Metro as the defendant. Howard also testified that someone had recently shot at the defendant's house and that no one was arrested for that incident.

¶ 8    Sternau testified that he used to work at the Cairo Police Department and knew there was a feud between rival rap gangs, one from the city of Mounds and one from the city of Cairo. Sternau testified he had arrested the defendant previously for minor incidents and had seen the defendant's rap videos. Sternau had viewed the surveillance video and said that even though it was a little grainy, he could identify the person in the video who was shooting as the defendant. Sternau also testified that he knew that someone shot at the defendant's car and house, and the defendant's mother was shot during one of those incidents.

¶ 9    Sergeant Charles Ellett and Detective William Bethel testified that the defendant was part of the YNM rap group from Cairo, and his rivals were part of the YME rap group from Mounds. Gary was part of the rap group from Mounds. While Gary appeared in the YME videos, he was not the main rapper. Ellett said that some of the YME videos mentioned the defendant's nickname in the lyrics. Bethel and Sternau testified that a video created by the Mounds group included threats of violence toward the defendant. Sternau had also seen some of the defendant's rap videos where the defendant was seen holding firearms and rapping about violence. Videos from both rap groups were played for the court.

¶ 10    Bethel obtained a search warrant for the defendant's phone records through AT&T, Snapchat, and Google. Several of the defendant's Snapchat messages were presented to the trial court, which contained images of firearms. The defendant also sent messages saying the police were looking for him, that the police had camera footage of him, and that he was leaving town. In the days and months following the shooting, the defendant searched Google for articles about the shooting, the difference between "murder" and "capital murder," what qualifies someone for

federal prison, and how to tell if someone is tracking your iPhone. He also searched Google for articles about a "peanut-butter color Glock" that was used in the shooting. Using software that maps a person's geolocation, Bethel was able to determine the defendant's movements the night of Gary's death. A video showing these movements was presented to the court, documenting the defendant travelling from Cairo to Carbondale and then fleeing the scene of the shooting.

¶ 11    Police collected surveillance footage from a Circle K where the defendant stopped for gas on his way to Carbondale. Records from the defendant's bank confirmed his transactions at that Circle K the night of the shooting. After confirming the defendant's identity, officers went to Cairo to search for the defendant but were unsuccessful in finding him.

¶ 12    On March 30, 2023, five months after the shooting, the defendant was arrested in Houston, Texas, by U.S. Marshals. Lieutenant Jarin Dunnigan of the Carbondale Police Department went to Houston and interviewed the defendant, which was audio recorded. In that interview, the defendant identified himself as the only person involved and would not identify anyone who was with him that night. The defendant confirmed he was left-handed. He was transferred to Carbondale, where officers interviewed him a second time on April 4, 2023, which was audio and video recorded. This video was admitted into evidence and played for the trial court. The defendant identified himself in the surveillance footage from Artistic Mind tattoo shop.

¶ 13    The defendant elected to testify in his own defense. He said that his nickname was Metro and that he created and posted videos on social media as part of the YNM rap group from Cairo. The defendant said he had seen videos created by YME, the rap group from Mounds, including one where the performers rapped that they would "[have him] running and shooting at [him]." The defendant stated that prior to the shooting in Carbondale, people had shot at his house and his car while his mother was driving. The defendant suspected that Gary was "possibly" responsible for

4

one of the shootings and said that he and Gary "didn't see eye-to-eye." The defendant testified that he was fearful that the rival rap group may try to kill him.

¶ 14 The defendant said that on the night of the shooting, he rode to Carbondale with two friends and stopped at a Circle K on the way there. They then went to The Strip, and while standing in front of Jimmy John's, they were approached by four to five men, one being Gary. The men said "what you all trying to do," which the defendant interpreted as a threat. The defendant testified that he saw the men, including Gary, pull out guns. At that point, the crowd around them began running. The defendant said as he was running he saw Gary in front of him and thought Gary was reaching for a gun. The defendant shot his gun twice. He said that he fled to Texas and, on cross-examination, admitted that he messaged his friends: "Yeah, the police want me fellas. I am gonna be cool though. I'm finna shoot way out of state. They ain't gonna catch me." Along with other messages, the defendant also admitted to sending the following message on Snapchat: "Police got me on camera and everything. They told my mama. I'm gone right now though. I'm just finna go out further."

¶ 15 The trial court found the defendant guilty of first degree murder and that he personally discharged a firearm pursuant to section 5-8-1(a)(1)(d)(iii) of the Unified Code of Corrections. 730 ILCS 5/5-8-1(a)(1)(d)(iii) (West 2022). The trial court stated that it "considered the testimony, evidence, arguments of counsel, had a chance to deliberate and review the exhibits and testimony, as well as the law in this case." The trial court acknowledged that it "[considered] the evidence, *** [considered] the self defense, [and] the second degree murder issue as well." The defendant filed a motion for a new trial, arguing that he should have been found guilty of second degree murder. The trial court denied that motion and set a sentencing hearing for April 23, 2025.

¶ 16    At the sentencing hearing, a letter written by the defendant's former school superintendent was admitted as evidence in mitigation. Trina Blackmon, Gary's mother, testified that her son was not even from Mounds and was trying to fit in. Blackmon testified that she believed the defendant showed no remorse in the courtroom. She said that Gary had a young son, and she herself could no longer work because of the shooting and was disabled due to chronic PTSD, depression, and anxiety. Victim impact letters were read from Gary's father and from the mother of Gary's son. In response to the court's invitation to make a statement in allocution, the defendant apologized to Gary's mother.

¶ 17    The State argued that few mitigating factors applied, because the defendant did not act under strong provocation. He chased the victim down and clearly did not think the victim, who did not possess a gun, was going to shoot him. The State argued that no one induced the defendant to shoot Gary, and the defendant was not justified in so doing. Regarding whether the defendant's conduct was a result of circumstances not likely to recur, the State argued that the defendant was already flashing guns on social media, making threats, prior to the shooting of Gary. Because of the severity of the offense, the statutory aggravating factors present, and that a life was lost, the State requested a sentence of natural life.

¶ 18    Defense counsel argued that the defendant had two small children and did not contemplate his conduct would cause harm because he was acting in the moment making poor decisions. Defense counsel argued that the defendant was under strong provocation, because he believed the rival rap gang was out to kill him. The defendant had no history of prior delinquency or criminal convictions. Defense counsel requested the minimum 45-year sentence.

¶ 19    At the conclusion of the sentencing hearing, the trial court stated:

"Let the record reflect the Court will make a part of the record a presentence investigative report. *** The Court will certainly consider the trial evidence heard during the course of the bench trial during this case. The Court will also note the victim impact statements given both in writing and orally here today from Ms. Trina Blackmon and then read by, I believe, Cousin Bland, B-L-A-N-D, from Mr. Gary's father and then the mother of his child as well, Trinity Stafford, I believe the name was Reggie Gary. ***

The Court will note Defense Exhibit No. 1, the statement prepared, written and presented to the Court, along with the photographs from Dr. Evers on behalf of Mr. Morse detailing his background, what he has gone through in his life, as well as during his school years as the superintendent of Cairo School District during that time period. The PSI greatly details Mr. Morse's life, background, as well, which we'll get into in a second also.

***

Ms. Allen asked for a natural life sentence in this case for Mr. Morse, citing various factors in aggravation under that statutory section, including specifically No. 7, a sentence being necessary to deter others from committing the same crime, but then arguing how various factors in mitigation should be given lesser weight in attempting to fashion an appropriate sentence in this case on these counts.

Ms. Korando argues in opposition to those and then also argues that those factors in mitigation, many of them should be given greater weight in attempting to fashion an appropriate sentence in this case. Ms. Allen challenges Nos. 2, 3, 4, 5, 8 and 9; that those should be given lesser weight or not considered or not applicable and that a greater sentence is necessary. Certainly, again, Ms. Korando challenges those, and in fact, cites Factor in Mitigation No. 2, that Mr. Morse did not contemplate that his criminal conduct would cause

7

or threaten serious physical harm to another; that he acted under strong provocation in committing the offense for which he was found guilty of in this case.

Number seven, that the defendant, Mr. Morse, has no history of prior delinquency or criminal activity essentially and has led a law-abiding life for essentially his juvenile and adult life—period of time of his life and that's detailed in the presentence investigative report. The lack of criminal history certainly is a factor in mitigation to be considered and argued by Ms. Korando.

Number eight, that the criminal conduct was a result of circumstances unlikely to recur if a lesser sentence was given.

Number nine, the character and attitude of Mr. Morse indicating that he would be unlikely to commit another crime if a lesser sentence was given.

\* \* \*

The Court will certainly consider the statement and the apology given by Mr. Morse here today in open court. \*\*\*

\*\*\*

This Court also considers, even though he is over the age of 18, the *Miller* factors, what are known as the *Miller* factors as well. In considering a sentence, most of those are covered in what we have already indicated, but also age, maturity, potential for rehabilitation, as well as youth, whether or not he was influenced and subjected to outside pressure, including peer pressure, negative influences, things of that nature. Certainly given his age at the time of this occurrence, this Court does consider those things and all of the *Miller* factors due to the youth when this crime was committed under that line of cases will be noted as well.

8

\*\*\*

Mr. Morse, you have always been respectful in court \*\*\*. You have been respectful to me. Obviously a lot of folks here care about you, including the superintendent even, and the folks that you have interacted with throughout your life. I certainly acknowledge that, but at the end of the day, we can't do what we did in this situation and a sentence must be imposed."

The trial court sentenced the defendant on count 1 to 35 years in the Illinois Department of Corrections (IDOC), with a mandatory supervised release period of up to 3 years, and to 30 years in IDOC for the firearm enhancement, to be served consecutively. The court informed the defendant that count 2 and the other gun enhancements would merge into count 1, making the total sentence 65 years in IDOC. The defendant did not file a motion to reconsider his sentence. The defendant now appeals his conviction and sentence.

¶ 20                                    II. ANALYSIS

¶ 21                          A. Sufficiency of the Evidence

¶ 22     Defendant contends that the evidence established, at most, the elements of second degree murder under section 9-2(a)(2) of the Criminal Code of 2012, because he acted under an unreasonable belief in the need for self-defense. 720 ILCS 5/9-2(a)(2) (West 2022). The defendant asks this Court to reduce his first degree murder conviction to a second degree murder conviction.

¶ 23     When reviewing a challenge to the sufficiency of the evidence, the relevant inquiry is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *People v. Cunningham*, 212 Ill. 2d 274, 278 (2004). It is the trier of fact's responsibility to assess credibility, resolve conflicts in testimony, and draw

9

reasonable inferences from the evidence. *People v. Brown*, 2013 IL 114196, ¶ 48. In a bench trial, the responsibility of weighing the credibility of the witnesses rests with the trial court. *People v. Coleman*, 301 Ill. App. 3d 37, 42 (1998). A reviewing court will not substitute its judgment for that of the trier of fact on such matters. *People v. Jackson*, 232 Ill. 2d 246, 280-81 (2009).

¶ 24 To mitigate first degree murder to second degree murder under section 9-2(a)(2), a defendant must prove by a preponderance of the evidence that, at the time of the killing, he believed the circumstances justified the use of deadly force, but that belief was unreasonable. *People v. Jeffries*, 164 Ill. 2d 104, 122-23 (1995); 720 ILCS 5/9-2(c) (West 2022). Although the defendant bears the burden of establishing the mitigating factor, the State must still prove beyond a reasonable doubt the absence of that factor once it is properly raised. *Jeffries*, 164 Ill. 2d at 127; *People v. Blackwell*, 171 Ill. 2d 338, 358 (1996). The question of whether a defendant acted under an unreasonable belief is one of fact to be determined by the trier of fact. *People v. Thompson*, 354 Ill. App. 3d 579, 587 (2004).

¶ 25 Here, the trial court expressly considered defendant's testimony that he believed the victim was reaching for a firearm. The court nevertheless found that the State disproved self-defense beyond a reasonable doubt. The evidence established that no firearm was recovered from the victim. Illinois courts have repeatedly held that the absence of a weapon on the victim, while not dispositive, is a circumstance the trier of fact may consider in rejecting a claim of self-defense or unreasonable belief. *People v. Harmon*, 2015 IL App (1st) 122345, ¶ 56. Additionally, the State introduced messages from the defendant's Snapchat account where he admitted to evading the police after the shooting. The defendant's Google searches referenced *supra* established his consciousness of guilt. The State also introduced a video of the defendant clearly shooting the

10

victim *in the back*, as the victim was running with the rest of the crowd *with his back* to the defendant.

¶ 26 Although the defendant points to prior tension between the two rap groups and evidence of additional gunfire nearby, the trial court determined that those circumstances did not establish a genuine subjective belief in the necessity of deadly force at the moment defendant fired his gun. See *People v. Shumpert*, 126 Ill. 2d 344, 352 (1989) (credibility determinations are for the trier of fact, particularly where the defendant's testimony is central to the claim of mitigation). Viewing the evidence in the light most favorable to the State, a rational trier of fact could conclude that the defendant failed to prove by a preponderance of the evidence that he acted under an unreasonable belief and that the State proved beyond a reasonable doubt the absence of that mitigating factor. We find that there was overwhelming evidence in support of the trial court's verdict that the defendant was guilty of first degree murder, and accordingly, we decline to reduce the defendant's conviction to second degree murder.

¶ 27 B. Excessive Sentence

¶ 28 The defendant next argues that his 65-year sentence is excessive given his "nonexistent" criminal history. The defendant concedes that he failed to preserve this issue but seeks first-prong plain error review. The plain error doctrine is a limited exception to the general forfeiture rule. *People v. Herron*, 215 Ill. 2d 167, 177 (2005); Ill. S. Ct. R. 615(a) (eff. Jan. 1, 1967). Plain error exists at sentencing when a clear error occurs, and "the evidence at the sentencing hearing was closely balanced." *People v. Hillier*, 237 Ill. 2d 539, 545 (2010). The threshold inquiry in any plain-error analysis is whether a clear or obvious error occurred. *People v. Piatkowski*, 225 Ill. 2d 551, 565 (2007); see also *People v. Williams*, 2022 IL App (2d) 200455, ¶ 104 ("If clear or obvious error did not occur, no plain-error analysis is necessary.").

11

¶ 29    "[T]he imposition of a sentence is a matter of judicial discretion and ***, absent an abuse of this discretion, the sentence of the trial court may not be altered upon review." *People v. Perruquet*, 68 Ill. 2d 149, 153 (1977). A trial court's sentencing determination is entitled to great deference because the trial court is in a superior position to weigh the relevant factors. *Id.* at 154. A finding of an abuse of discretion is only appropriate where the "trial court's decision is arbitrary, fanciful, or unreasonable to the degree that no reasonable person would agree with it." *People v. McDonald*, 2016 IL 118882, ¶ 32. A reviewing court may not substitute its judgment merely because it might have weighed the factors differently. *People v. Stacey*, 193 Ill. 2d 203, 209 (2000). "A sentence which falls within the statutory range is not an abuse of discretion unless it is manifestly disproportionate to the nature of the offense." *People v. Jackson*, 375 Ill. App. 3d 796, 800 (2007). It will be disturbed only if it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010).

¶ 30    Under the Illinois Constitution, all penalties must be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship. Ill. Const. 1970, art. I, § 11; *People v. Clemons*, 2012 IL 107821, ¶ 29. "The seriousness of the crime is the most important factor in determining an appropriate sentence, not the presence of mitigating factors *such as the lack of a prior record*, and the statute does not mandate that the absence of aggravating factors requires the minimum sentence be imposed." (Emphasis added.) *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002).

¶ 31    Here, the trial court considered the presentence investigation report, statutory factors in mitigation and aggravation, arguments of counsel, and the defendant's apology to the victim's mother. The court acknowledged the defendant's lack of criminal history but emphasized the

12

serious nature of the offense, the public setting in which it occurred, and the devastating impact on the victim's family. The court's extensive comments at the sentencing hearing demonstrate that it did not ignore mitigating factors but instead assigned greater weight to the seriousness of the offense and the need for deterrence, which are factors it was entitled to prioritize. Merely because the court did not accord the defendant's lack of criminal history the weight he desired does not establish an abuse of discretion. Given that the sentence falls within the statutory range and reflects a reasoned consideration of the relevant factors, we find no abuse of discretion, and consequently, no error. Where there is no error, there can be no plain error. *Williams*, 2022 IL App (2d) 200455, ¶ 104.

¶ 32                                III. CONCLUSION

¶ 33    For the foregoing reasons, we affirm the defendant's conviction and sentence.


¶ 34    Affirmed.