THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CHRISTOPHER BABBINGTON, Defendant-Appellant.

First District (2nd Division)   No. 1—94—2902

Opinion filed February 11, 1997.—Rehearing denied March 13, 1997.

Rita A. Fry, Public Defender, of Chicago (Emily Eisner, Assistant Public Defender, of counsel), for appellant.

Richard Devine, State's Attorney, of Chicago (Renee Goldfarb, William D. Carroll, and Owen D. Kalt, Assistant State's Attorneys, of counsel), for the People.

JUSTICE McNULTY delivered the opinion of the court:

After a jury trial, defendant Christopher Babbington was found

guilty of second degree murder and aggravated battery with a firearm and sentenced to two 14-year terms, to run concurrently. Defendant appeals, contending that: (1) the evidence was insufficient to rebut his claim of self-defense; (2) he was improperly convicted by a panel of 13 jurors when an alternate juror participated in deliberations; (3) the trial court erred in excluding defendant's prior consistent statement describing the decedent's gun; (4) the trial court erred in excluding evidence that the decedent's gun was not registered in Illinois; (5) the trial court violated defendant's right to a public trial when it excluded an acquitted defendant from the courtroom; (6) the trial court improperly admitted information about the decedent's background into evidence; and (7) the trial court admitted inadmissible hearsay statements made by the decedent. We reverse and remand.

Qadree El-Amin testified that he was the assistant road manager of the singing group Boyz II Men. El-Amin was in charge of security for the group. Roderick Khalil Roundtree, the decedent, was the group's road manager. From May 23 to May 25, 1992, Boys II Men and their entourage and other musical groups and their entourages were staying at the Guest Quarters Hotel in Chicago.

At 5 a.m. on May 25, 1992, El-Amin and his girlfriend, Alisa Watson, were asleep in a room on the twenty-sixth floor of the hotel, one floor below the decedent's suite, when they were awakened by the deceased screaming El-Amin's name. El-Amin testified that the decedent sounded scared. El-Amin told Watson to call security as well as two friends employed as security for the band. El-Amin quickly dressed and ran into the hallway. When El-Amin entered the hallway, he saw the decedent standing half on and half off one of the elevators. El-Amin saw defendant, Kenneth Copeland and Christopher Foley inside the elevator. El-Amin testified that defendant was wearing an expression like "nothing is happening." The decedent appeared to be scared and said, "[T]hese guys was [sic] trying to break in my room, what do you all want, what do you all want?" El-Amin said, "Let's take 'em downstairs to security." El-Amin stepped into the elevator. As the doors closed, defendant's expression changed "to more of a suspicious-type person." El-Amin testified that the defendant and the other two men charged at him and the decedent. During the ensuing scuffle, El-Amin saw sparks fly from defendant's direction and heard three gunshots, but did not see a gun. The elevator door opened on the twenty-sixth floor, and defendant and the two other men ran out. El-Amin saw what appeared to be burn marks on the decedent's forehead and bare chest. El-Amin then went to his room and told his girlfriend to call security. El-Amin then headed for

the lobby, taking a different elevator. El-Amin then noticed that he had been shot in the knee.

El-Amin picked defendant, Copeland and Foley out of a lineup. He indicated that the gunshots came from the left side of the elevator, where defendant was standing.

El-Amin's girlfriend, Alisa Watson, testified that she was asleep in El-Amin's hotel room when she heard the decedent yelling for El-Amin. She testified that the decedent sounded scared, like he needed help. Watson heard the decedent yell, "[T]here are three motherfuckers out here on me."

Jeanetta Maddox testified that she was with the decedent in his hotel suite when they were awakened at 5 a.m. by voices in the hallway. The decedent went to the door and spoke to someone in the hallway. A few seconds later, the decedent left the room. Moments later, she heard El-Amin's name called, followed by gunshots.

Craig Brooks testified that he was the road manager for the musical group Hammer and was staying in a suite on the twenty-seventh floor of the hotel, when at 5 a.m., he was awakened by a knock at the door. Defendant, Copeland and Foley were at the door, and they asked Brooks where the party, Hammer and the girls were. Brooks told them that they missed the party and that if they did not see the girls downstairs, the girls must have left. Brooks testified that the men did not appear to be causing problems. Five minutes later, Brooks was told that the decedent's body had been discovered in the elevator.

Hotel security guard Glenda DeBerry testified that on May 25, 1992, she was working the night shift in the lobby, when at 5 a.m., she received a telephone call from a room on the twenty-seventh floor, complaining of noise in the hallway and requesting that she ask the people to keep it down. Heading toward the elevators, she met El-Amin in the lobby and he reported the shooting of the decedent. El-Amin asked her not to call the police, because he and his friends would "handle it." El-Amin told her that he had also been shot and then passed out. DeBerry then directed the night auditor to call the police, who arrived in 10 minutes. DeBerry walked toward the elevators and saw defendant walk quickly out of the staircase. She did not notice any injuries on defendant.

Leslie Beauzial testified that she and defendant work for Standard Parking Corporation, parking cars at the hotel. Beauzial testified that, at 4 a.m., defendant and two friends arrived at the hotel, left their car in front of the hotel, and entered the hotel lobby. DeBerry also saw defendant and his friends return to the car and drive away at a medium fast speed.

Don Stewart, director of security for the hotel, testified that the hotel has a strict policy forbidding employees from being on hotel property when they are off duty.

Adrien Norfleet, a dancer with the musical group Hammer, testified that he was in a room on the twenty-seventh floor of the hotel when he looked out into the hallway and saw three neatly dressed men, whom he identified as defendant, Copeland, and Foley. Soon thereafter, he heard loud talking in the hallway, so he opened his door and saw the decedent escorting the three men to the elevator. Norfleet looked down the elevator shaft and saw the decedent attempting to stop the elevator door from closing on the twenty-sixth floor. He summoned security, but when he returned, he heard three gunshots and the sound of footsteps. Norfleet saw the decedent's body when it came up in the elevator to the twenty-seventh floor and noticed that there was a gun protruding from the left pocket of the decedent's shorts.

Sonya Parks testified that she was in Norfleet's hotel room when she heard people knocking on doors in the hallway. She looked out and saw defendant, Copeland and Foley. Later, when she saw the decedent's body in the elevator, she saw a gun handle and part of a gun sticking out of the decedent's pocket.

Officer Patrick Moran testified that, at 5 a.m. on May 25, 1992, he went to the twenty-seventh floor of the Guest Quarters Hotel in Chicago and saw a large black male lying dead on the floor of the elevator, which had been stopped with the doors open. In the elevator were five assorted garment buttons. On the floor near the elevator door was a pistol. He lifted a fingerprint from a drinking glass that was recovered in the elevator and found that it matched Foley's print.

Detective Baldree testified that on May 28, 1992, he went to Foley's home, after Foley was in custody. Foley's mother directed the detective to a rear porch, where he recovered a .38-caliber handgun inside a video cassette recorder. A firearms expert testified that, in his opinion, a bullet recovered from the decedent's body was fired from that gun. A second bullet removed from the decedent's body and the bullet recovered from El-Amin's knee were consistent with the gun recovered from Foley's home, but were too mutilated for comparison. In the expert's opinion, the gun had been fired three times and could not be discharged without pulling the trigger. The other pistol, which had been recovered from the decedent's pocket, was a .38 semi-automatic which the expert determined had not been fired.

The medical examiner testified the decedent's death was caused

by two gunshot wounds. A bullet wound to the decedent's right shoulder was surrounded by stippling, which indicated close-range firing. The decedent's blood tested negative for opiates, alcohol, and a cocaine derivative. The decedent was 6 feet 3 inches tall and weighed 322 pounds.

Detective Zuley testified that on June 4, 1992, Foley's mother handed him two shirts and two coats inside a trash bag. Foley's mother identified the clothes as belonging to defendant, Foley, and Copeland. A trace-evidence analyst testified that he examined the clothes. The shirts belonging to defendant and Foley were missing buttons that matched buttons recovered from the elevator. Missing from Copeland's jacket was a metallic strap matching one recovered from the elevator. All of the clothing had been damaged in an apparent struggle, but there was no major damage to defendant's shirt. Defendant's jacket had two soot marks on the inside, a perforation near the waistband, and two smudge marks on the outside that tested positive for lead. The expert determined that the marks indicated that a pistol had been discharged from within defendant's jacket.

Paramedic Randall Anderson testified that, while tending to the decedent's body, he felt the gun in the pocket of the decedent's shorts and removed it while checking for vital signs.

Defendant testified in his defense that he is in the ready reserves of the Army National Guard after completing active duty. On the day of the incident, he worked parking cars at the Guest Quarters Hotel from 11 a.m. to 7 p.m. as scheduled. After work, he met with Copeland and Foley and visited several nightclubs. In the early morning hours, they returned to the hotel to check the posted schedule to see if defendant had to work the next morning and to see if the musical groups staying there were having a party, since they were hoping to find some women. The parking attendant on duty allowed them to park their car in front of the hotel. Defendant testified that he walked into the attendant's booth and checked the work schedule, and then entered the lobby with his friends. Defendant, Copeland and Foley rode the elevator to the twenty-sixth floor, where they thought some women had gone. The men were intoxicated and knocking on doors. When nobody answered, they went to the twenty-seventh floor. After getting no information on a party from either Sonya Parks or Craig Brooks, defendant knocked on the decedent's door. The decedent was very angry and upset at being disturbed. The decedent was hollering and swearing in the doorway, and then he stepped back into the suite and told the men to wait and threatened them, telling them not to leave. Defendant, Copeland and Foley walked to the elevator. While waiting for the elevator, defendant asked Copeland for the

gun, because he believed that the decedent might be telephoning authorities and that, as a hotel employee, defendant would be less likely to get in trouble for possessing the gun. Copeland handed defendant the gun. Defendant concealed the gun on his person. Defendant acknowledged that he was not supposed to be in the hotel and could have lost his job if he had been caught in the hotel.

Defendant testified that the elevator doors were closing behind them when the decedent stopped the doors with his arm. The decedent was holding a gun when he stepped into the elevator. The decedent yelled profanities while he asked the men what they were doing there. The decedent then began pistol whipping the three of them. The decedent struck defendant with the handgun several times across the nose, lip and back of the head. Defendant's nose and lip were bleeding.

The elevator stopped one floor below. The decedent was keeping the elevator doors from closing and was calling someone's name. Qadree El-Amin entered the elevator and began punching the three men and tried with the decedent to pull the men off of the elevator. The three men were crouched near the floor attempting to deflect the blows. Defendant emerged from the crouched position and fired Foley's gun while the decedent was on top of him and was swinging at defendant's head with the pistol butt. Defendant testified that his shooting was sporadic and not aimed. Defendant testified that, up until that moment, he had left the handgun in his pocket and he took it out and fired it because he was afraid and did not know how many more times the decedent would strike him with the gun or what subsequent violence was in store for him.

After the gunfire, defendant and his friends ran off the elevator and went down the stairway to the lobby. Defendant was arrested at his home later that day. Defendant admitted at trial that he lied to police when he claimed that El-Amin had fired the fatal shots.

The jury found defendant guilty of second degree murder and aggravated battery with a firearm, and the trial court sentenced defendant to two 14-year terms, to run concurrently.

■ We first address defendant's contention that the evidence at trial was insufficient to rebut his self-defense claim. Self-defense is an affirmative defense and, therefore, once raised, the State has the burden of proving beyond a reasonable doubt that the defendant did not act in self-defense, in addition to proving the other elements of the offense beyond a reasonable doubt. *People v. Seiber*, 76 Ill. App. 3d 9, 394 N.E.2d 1044 (1979). The elements of self-defense are: (1) that force is threatened against a person; (2) that the person threatened is not the aggressor; (3) that the danger of harm is im-

minent; (4) that the force threatened was unlawful; (5) that the person threatened must actually believe that a danger exists and that the kind of force he uses is necessary; and (6) that such beliefs are reasonable. *People v. Balfour*, 148 Ill. App. 3d 215, 498 N.E.2d 547 (1986). When a trier of fact determines that the evidence presented at trial negates the existence of any one of these elements beyond a reasonable doubt, the State has carried its burden. *People v. Harmon*, 200 Ill. App. 3d 411, 558 N.E.2d 173 (1990).

■ While defendant claims that he shot the decedent in order to stop decedent from pistol whipping him, several witnesses testified that the pistol was found in the decedent's pocket, not his hand. Furthermore, although the evidence technician testified that he found the decedent's gun near the elevator door, a paramedic who arrived at the scene before the technician testified that he removed the gun from the decedent's pocket and placed it near the door. This evidence was sufficient for a jury to find that the State carried its burden in demonstrating that the decedent presented no imminent threat to defendant and that defendant had no reasonable belief that any danger existed that would require the use of deadly force.

Defendant's next contention is that his convictions must be reversed since he was tried by 13 jurors. Defendant claims that although the trial judge dismissed the three alternate jurors prior to deliberations, alternate juror Loutitia Smith deliberated with the jury, stayed overnight in the hotel with the sequestered jurors, signed the verdict forms the next day, and responded when the jury was polled.

The record reveals that, prior to deliberations, the trial judge excused alternate juror Smith, along with the other alternates, telling them that because all the regular jurors were healthy and able to stay through the trial, the alternates would not be deliberating on the case. The trial judge informed the alternates that they could remain in the courtroom and speak with the judge after the jury retired to the jury room. The trial judge then informed the alternates that, if they had anything in the jury room, they should go into the jury room for a few minutes before the jury entered and remove those items. The trial judge then told the alternates to take seats in the front row while the jurors retired to the jury room.

When the jury did not reach its verdict after several hours of deliberating, it was sequestered overnight and reached its verdict the following morning. There were 12 signatures on each of the two verdict forms returned by the jury. Alternate juror Smith signed the verdict forms, while regular juror Willie Nunn did not. When the trial court polled the jury, the trial transcript shows that 13 jurors,

including regular juror Willie Nunn and alternate juror Loutitia Smith, assented orally.

Defendant raises for the first time, in his appellate brief, his claim that he was denied a fair trial since 13 jurors, one an alternate who had been excused prior to deliberations, deliberated on this case. While this appeal was pending, the State filed a motion to amend the record with a replacement transcript. The State claimed in its motion that the court reporter, as verified by her affidavit, made a typographical error in transcribing the polling of the jury and that only 12 jurors were actually polled. The State's motion claims that regular juror Nunn did not respond to the polling, but does not deny that dismissed alternate juror Smith did respond. Defendant objected to this proposed amendment and submitted an affidavit from defense counsel, stating that the court reporter informed counsel that she now believes that she did not make an error in transcribing the polling of the jurors and believes that 13 jurors, the 12 regular jurors and alternate juror Smith, were polled. The State's motion to amend the record and defendant's objections were ordered taken with the case.

■ We deny the State's motion to amend the record. Regardless of whether 12 or 13 jurors responded to the polling, it is undisputed that excused alternate juror Smith deliberated with the jury and signed the verdict forms. The amended transcript is therefore not necessary in order to resolve the issue of whether defendant was prejudiced by Smith's participation in the deliberations.

■ The State claims that defendant waived his objection to the participation of the alternate juror by failing to notice the alternate's participation and object to such when the verdict was returned, and in failing to raise the matter in his post-trial motion for a new trial. In support of this argument, the State relies on *People v. Escobedo*, 151 Ill. App. 3d 69, 502 N.E.2d 1263 (1986), and *People v. Patterson*, 163 Ill. App. 3d 370, 516 N.E.2d 642 (1987). In *Escobedo*, the defendant claimed that his convictions were vitiated when a prospective juror whom defendant had peremptorily challenged, and whom the trial court had excused during *voir dire*, served on the jury, which found defendant guilty. The defendant claimed that he and his attorneys were not aware of the juror's participation until the record on appeal was reviewed. The court noted that defendant and his attorney had an opportunity to view the excused juror as she participated in the jury's hearing of the evidence at trial. The court found that defendant had a duty to advise the court of any infirmity in the jury as sworn at the earliest opportunity. By failing to recognize and call to the court's attention the fact that a juror who was challenged

and excused was in fact in service upon the jury, defendant waived this issue for purposes of appeal.

In *Patterson*, a prospective juror who had been peremptorily challenged by the State and excused by the trial court signed the verdict form finding defendant guilty. The court found that defendant waived the right to argue that the integrity of his trial had been jeopardized by the participation of the excused juror, since he never objected to the composition of the jury at any time during trial or jury deliberations, never objected to the juror's presence at the return of the verdict or at the polling of the jury, and failed to raise the matter in his motion for a new trial.

In *Escobedo* and *Patterson*, the excused juror's participation on the jury occurred at the commencement of trial and continued throughout the trial. Thus, defendant and his counsel had ample opportunity to notice that the excused juror was sitting on the jury and to bring this error to the attention of the court. Here, however, juror Smith served as an alternate throughout trial and was unequivocally excused when deliberations began. Any impropriety concerning Smith did not occur until deliberations began, when Smith either participated in deliberations in addition to a regular juror or instead of a regular juror. Defendant and his counsel would have had only a brief opportunity to notice Smith's participation on the jury after the verdict was returned and the jury was polled. During these few minutes nobody, not even the court or the State, noticed the alternate juror's participation. Under these circumstances, we find no waiver based on defendant's failure to object to Smith's participation in deliberations. Furthermore, although defendant did not raise any issue regarding Smith's participation in his post-trial motion, we believe this is an issue of plain error. See *United States v. Olano*, 507 U.S. 725, 123 L. Ed. 2d 508, 113 S. Ct. 1770 (1993).

It is clear that alternate juror Smith was excused by the trial court and told that she would not be deliberating with the jury. It is also clear that Smith somehow ended up deliberating with the regular jurors since she signed the verdict forms and responded to the polling of the jurors. What is not clear, however, is whether she deliberated instead of one of the regular jurors or in addition to the 12 regular jurors. Either scenario would have caused defendant prejudice.

If alternate juror Smith deliberated instead of regular juror Nunn, this arrangement probably resulted from a collusion between Smith and Nunn. The change in jurors occurred without the knowledge or consent of defendant, or even the State or the court. This was certainly prejudicial to defendant, since a defendant has a right to

know the composition of the jury that will be deliberating on his case.

The other possible scenario is that defendant was tried by 13 jurors, alternate juror Smith and the 12 regular jurors. In the few cases that address the presence of alternate jurors during deliberations, the courts considered whether the defendants were prejudiced when the trial courts violated the federal rule requiring alternates to be dismissed after the jury retires to deliberate. In *Olano*, two alternate jurors were permitted to retire with the jury, but were instructed by the trial court not to participate in the deliberations. Defendant failed to object to the presence of the alternates. Applying the plain error standard, the Court stated that the presence of the alternative jurors during deliberations, although a violation of Federal Rules of Criminal Procedure, would only affect defendant's substantial rights if prejudicial impact were shown. The Supreme Court noted that the presence of alternate jurors during deliberations might prejudice the defendant if the alternates actually participated in deliberations either verbally or through body language, or because the presence of the alternates had a chilling effect on the regular jurors. The Court found that defendant made no showing that the alternate jurors either participated in the jury's verdict or chilled deliberations by regular jurors and it must be presumed that the alternates followed the trial court's instructions and did not participate in deliberations.

In *United States v. Ottersberg*, 76 F.3d 137 (7th Cir. 1996), when the jury retired for deliberations, the court permitted the two alternates to retire with the jury to deliberate. Defendant never objected. The alternates were given no instructions that they were not to deliberate with the regular jurors. When the verdict forms were returned with only 12 signatures, the trial court noted that the alternates had deliberated along with the rest of the jurors and instructed the entire jury to retire with the alternates to allow the alternates to sign the verdict forms. The seventh circuit found that prejudice occurred since, assuming the jurors followed the court's instructions, the alternates deliberated with the regular jurors and reached a unanimous verdict. Furthermore, to find that the alternates did not participate would require the ludicrous presumption that the alternates sat mute in the jury room for $9^1/2$ hours. The court found that allowing defendant's verdict to stand would seriously affect the fairness and integrity of the proceedings.

In *United States v. Houlihan*, 92 F.3d 1271 (1st Cir. 1996), despite defendant's objections, the trial court refused to discharge the alternate jurors once deliberations commenced and allowed the

alternates to have intermittent contact with the regular jurors during deliberations. However, the alternates were not present during deliberations and during the alternates' contact with the regular jurors, no discussion of the substance of the case occurred. The court repeatedly instructed the jurors not to discuss the case with the alternates or to deliberate in their presence, and instructed the alternates not to discuss the case amongst themselves or with the regular jurors. The regular jurors retired to one room and alternates retired to another room. Under these circumstances, the first circuit concluded that defendant suffered no prejudice by the mere fact that the alternate jurors were not dismissed.

■ In the instant case, it is clear that Smith participated in the deliberations since she signed the verdict forms and responded to the judge's polling. We, therefore, cannot say that her presence had no impact on the jury's verdict. Thus, regardless of whether Smith deliberated instead of a regular juror or in addition to the 12 regular jurors, there is no doubt that defendant was denied his right to a fair trial. We therefore reverse defendant's conviction and remand for a new trial.

We have carefully reviewed the other issues raised by defendant in this appeal and address only those issues where error occurred so as to assure that these errors do not occur on remand. Defendant claims that the trial court improperly permitted the prosecutor to introduce evidence of the decedent's background in the plumbing business, his ambitions and his success in the music industry, that band members respected him and thought of him as a father figure, and that the band had a clean-cut image, sang love ballads, and had won many awards. Defendant contends that this evidence is inadmissible since he did not challenge the decedent's character.

■ The trial court overruled defendant's objections to these comments, based on defense counsel's comments in opening statement characterizing the decedent as "an extremely large thug" and as "an enraged mountain of a man." The prosecution may put on evidence to prove the victim's peaceful character if in opening statement defendant first attacks the victim's character for peacefulness. *People v. Whiters*, 146 Ill. 2d 437, 588 N.E.2d 1172 (1992). Here, however, the State went too far when it introduced evidence of decedent's background and the fact that members of the band thought of him as a father figure. The introduction of irrelevant information about a crime victim's personal traits or familial relationships has been condemned by the supreme court. *People v. Lewis*, 165 Ill. 2d 305, 651 N.E.2d 72 (1995). Furthermore, the fact that the band had won many awards is irrelevant.

■ Defendant also claims that his constitutional right to confrontation was violated when inadmissible hearsay was used to insinuate that defendant was attempting to break into the decedent's hotel room. The decedent's assistant, Qadree El-Amin, was permitted to testify to overhearing the decedent accuse the men in the elevator by saying, "[T]hese guys was [*sic*] trying to break into my room, what do you all want, what do you all want?" Defendant claims that this statement should not have been admitted because it did not satisfy the criteria for the spontaneous declaration exception to the hearsay rule.

In order for an out-of-court statement to fall within the spontaneous declaration exception to the hearsay rule, three elements must have existed: (1) an occurrence sufficiently startling to produce a spontaneous and unreflecting statement; (2) absence of time to fabricate; and (3) a statement that related to the circumstances of the occurrence. *People v. Hart*, 214 Ill. App. 3d 512, 573 N.E.2d 1288 (1991). The event is satisfactorily proved if there are circumstances consistent with it having happened. *People v. Leonard*, 83 Ill. 2d 411, 415 N.E.2d 358 (1980); *People v. Merideth*, 152 Ill. App. 3d 304, 503 N.E.2d 1132 (1987). Here, there was no circumstantial evidence corroborating the decedent's statement that the men were trying to break into his room. Therefore, this statement should not have been admitted under the spontaneous declaration exception to the hearsay rule.

Accordingly, for the reasons set forth above, we reverse and remand for a new trial.

Reversed and remanded.

RAKOWSKI and TULLY, JJ., concur.