2020 IL App (1st) 180711-U

No. 1-18-0711

Order filed February 25, 2020.

Second Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | No. 2014 CR 6603 |
| | ) | |
| HAROLD COOK, | ) | The Honorable |
| | ) | William H. Hooks, |
| Defendant-Appellant. | ) | Judge Presiding. |

_____

JUSTICE LAVIN delivered the judgment of the court.
Justices Pucinski and Coghlan concurred in the judgment.

**ORDER**

¶ 1    *Held*: Defendant's conviction for first degree murder is affirmed where the trial court applied the correct legal standard and rationally concluded that defendant failed to establish a mitigating factor for second degree murder.

¶ 2    Following a bench trial, defendant Harold Cook was found guilty of six counts of first degree murder and sentenced to 45 years' imprisonment. He appeals, claiming that the trial court

erroneously convicted him of first degree murder because he made the required showing for second degree murder and the court applied the wrong legal standard. We affirm.

¶ 3 Defendant was charged by indictment with six counts of first degree murder. 720 ILCS 5/9-1(a)(1), (2) (West 2014).

¶ 4 Chicago police officer Thomas Harris testified that on March 14, 2014, he was in plainclothes driving an unmarked vehicle on Pulaski Road near Van Buren Street at approximately 12:45 p.m. He noticed a crowd of 25 to 30 people forming around a fight between two men. Harris was 50 feet away with an unobstructed view. When the fight stopped, he heard a gunshot. He looked in the direction of the sound and saw a man shooting at one of the fighters, both of whom were unarmed. Harris identified the shooter as defendant in court.

¶ 5 Defendant fired several more shots, then walked towards Pulaski and entered a vehicle occupied by two women. His firearm was in a slide-lock position, indicating that he had fired every bullet in the clip. Harris reported the incident by radio and followed the vehicle. After defendant exited at a red light on Pulaski, other police vehicles arrived, and Harris helped the officers arrest defendant.

¶ 6 On cross-examination, Harris stated that the Pulaski and Van Buren area had gang activity in the past. In his experience, gang members sometimes carry firearms. When the fight ended, the two men did not shake hands. The gunfire started 10 to 15 seconds after the fight ended. On redirect, Harris confirmed he never saw either fighter with a weapon.

¶ 7 Detective William Fiedler testified that on March 14, 2014, he responded to the 4000 block of West Van Buren and saw Wilson on the ground with gunshot wounds. Fiedler learned of a

witness, Deloris Slater. That evening, he showed Slater a lineup that included defendant, and she identified defendant as the shooter.

¶ 8    Slater testified that on March 14, 2014, she was at her home near Van Buren and Pulaski. She saw the fight from her porch and recognized the two fighters as Wilson and "Skip." The fight lasted 15 to 20 minutes. At some point, a girl became involved, but onlookers stopped her. The fight ended because "[s]omeone came around the corner shooting." The shooter stopped in front of Slater's house and shot Wilson, who was running away. Slater confirmed that she made an identification at a lineup.

¶ 9    On cross-examination, Slater confirmed that she often saw Wilson near her house, usually with his son. She denied telling Fiedler that she saw another man and woman strike Wilson while he fought with Skip. When the shooter came around the corner, Wilson started running. She was not sure how many times Wilson was shot, but the shooter stopped firing after Wilson fell to the ground.

¶ 10    Officer Nick Beckman testified that on March 14, 2014, he and his partners responded to the shooting. Near Pulaski and Washington Street, Beckman observed a man exiting the front passenger seat of a maroon or red vehicle. The vehicle matched the description from dispatch, so Beckman curbed it. A woman was driving with a younger woman in the back seat. Beckman removed the women and secured the vehicle. He observed a black handgun in a slide-lock position on the floorboard of the front passenger seat. Other officers arrested the man who had exited from the passenger seat, and Beckman identified defendant as that man in court.

¶ 11    The State entered five stipulations into evidence. First, Chicago Police Department (CPD) forensic investigator Eric Szwed would testify that he processed the scene of Wilson's shooting,

photographed the body, and recovered 11 fired cartridge cases nearby and a firearm from the front passenger side floor of a maroon Chevrolet Cobalt. Second, Illinois State Police (ISP) forensic scientist Gregory Hickey would testify that he examined the recovered firearm and cartridge cases, and would opine to a reasonable degree of scientific certainty that the cartridges were all fired from the firearm.

¶ 12    Third, CPD forensic investigator Elizabeth Dawson would testify that she performed a gunshot residue test on defendant on March 14, 2014. Fourth, ISP forensic scientist Ellen Chapman would testify that she examined the collection kit and would opine to a reasonable degree of scientific certainty that the results demonstrated that defendant discharged a firearm, contacted a primer gunshot residue related item, or had both hands in the environment of a discharged firearm.

¶ 13    Finally, Cook County assistant medical examiner Dr. Marta Helenowski would testify that she performed an autopsy on Wilson on March 15, 2014. She would opine to a reasonable degree of scientific certainty that Wilson's death was a homicide caused by a gunshot wound to the back of the neck.

¶ 14    The defense called Deandre Benamon, defendant's brother. Benamon testified that on March 14, 2014, he drove to the area of Pulaski and Van Buren and waited for Antoinette Rice, the mother of his child, to exit a train. He saw Rice walking with Wilson. At some point, Rice ran to Benamon and said that Wilson threatened to "f*** her up" because she was "in his business with her little sister and her baby mom."[1] Benamon then drove to Wilson, lowered the window, and confronted him. Wilson reiterated the threat.

---

[1]Over the State's objection, the court admitted this testimony for its effect on Benamon and not the truth of the matter asserted.

¶ 15    Benamon drove away with Rice, dropped her off, and picked up his uncle. He also called his mother and told her "who [he] had an argument with and where they was [*sic*] from and if anything was going to happen," because he knew "them [*sic*] guys was capable of the things they do when they get into it with people." Benamon identified Wilson as a member of the New Breeds gang and saw him every day selling drugs near the area where the confrontation occurred. During the call, Benamon heard defendant in the background.

¶ 16    Benamon and his uncle returned to Pulaski and Van Buren and confronted Wilson and his friends. A friend of Wilson's told Benamon to "squash" the issue because they did not want to attract police attention to the area. Benamon and his uncle exited the vehicle, and Wilson and Benamon started fighting. During the fight, Wilson removed his shirt. Wilson fell on top of Benamon, and Benamon's sister, who was in the crowd, "jumped in." Wilson's friends helped to break up the fight at this point. One of Wilson's friends grabbed Benamon and walked with him towards Pulaski. The man asked Benamon if he had calmed down, which he affirmed.

¶ 17    Benamon then saw defendant two to three feet from Wilson. Defendant asked Wilson if he was "cool," to which Wilson responded that he would "kill one of you b***." Benamon felt threatened. He started to walk away, heard gunshots, and immediately took cover.

¶ 18    On cross-examination, Benamon admitted he had a conviction for unlawful use of a weapon by a felon. He and Wilson knew each other because Wilson dated one of Rice's sisters, but the two men had never fought before. Benamon and his uncle did not carry weapons during the incident, and Benamon never saw Wilson with a weapon. To Benamon's knowledge, no one touched defendant or threatened him with a weapon prior to the shooting.

¶ 19    Benamon gave a statement to the police on March 15, 2014. He did not remember if he told the police "anything about [Wilson] not being cool with it." He did not tell the police that Wilson threatened to kill him because "they never asked me."

¶ 20    On redirect, Benamon stated that he believed Wilson wanted to continue the fight based on his comment about killing someone. Additionally, Wilson's friends were not "acting in a calm and peaceful manner" towards defendant in the moments prior to the shooting. Benamon lived on the west side of Chicago and had seen members of the New Breeds carry firearms on the streets of his neighborhood. On recross-examination, Benamon denied knowing that defendant was the shooter, but acknowledged yelling that defendant was "bogus" after the shooting.

¶ 21    Defendant testified that he was at his mother's house on March 14, 2014, when Benamon called to say "he got into an argument with someone." Following the call, defendant, his mother, and his sister drove to Gladys and Pulaski. Defendant brought a firearm with him because "it's a violent neighborhood" and "[t]hings happen to innocent people all the time." He had recently witnessed someone being shot and killed during an incident where the shooter did not initially brandish a firearm. Defendant did not know if Wilson or his friends had a firearm, but had seen Wilson selling drugs before.

¶ 22    Defendant arrived and saw Benamon and Wilson fighting. He tried to break up the fight after seeing his sister "get involved." Defendant moved his sister out of the way and asked Wilson if the situation was over. Benamon had walked away at that point, but Wilson said it was not over, and that he would "kill" someone. Defendant believed that Wilson and his friends were still acting aggressively.

¶ 23    After Wilson said he would kill someone, he walked towards some clothing by a dumpster. Defendant, believing Wilson was "going for a gun," shot at Wilson, who "took off running." Defendant fired until Wilson stopped running because he was concerned that Wilson would "turn around and *** shoot." Wilson's hands were not visible when he started to run. Defendant fired the first shot because he believed Wilson "was going to put our life in danger," and fired the last shot so Wilson "wouldn't turn back around."

¶ 24    The defense played a video of defendant chained to a bench in a police station. Defendant agreed that he told a detective that someone approached him and "was going to pull a gun on [him]," instead of telling the truth, because he was uncomfortable and did not want to help the police.

¶ 25    On cross-examination, defendant said he ensured his firearm was loaded before he left his mother's house. His first intention was to go to his girlfriend's house, and he did not know that the crowd was for the fight between Benamon and Wilson until he walked up to see what was happening. Defendant never spoke with Wilson before the fight, and Wilson had never fought with or threatened him in the past.

¶ 26    After the fight ended and Benamon walked away, defendant heard Wilson make threats and say words defendant agreed "offended" and "frightened" him. Defendant never saw Wilson with a weapon. When Wilson reached for his clothing, his back was turned and he was standing 5 to 10 feet from defendant. Defendant could not recall whether he fired 11 shots, but believed it was four or five. After the shooting, defendant returned to his mother's vehicle and entered the passenger seat. He left the firearm in the vehicle, and agreed that he exited when police arrived because he knew he did something wrong.

¶ 27    On redirect, defendant stated that Wilson sold drugs and was a member of the New Breeds, whom defendant believed "kill all the time." He was concerned that if he waited to see if Wilson had anything in his hands after reaching for his clothing, "he probably could have shot me and my people that was [*sic*] out there." On recross-examination, he denied intending to kill Wilson, but admitted to firing straight at him.

¶ 28    Defendant recalled Fiedler, who testified that the shooting occurred in a "high crime district." Fiedler added that Slater reported seeing a man and woman strike Wilson while he was fighting.

¶ 29    In rebuttal, the State introduced a record of defendant's conviction for manufacture or delivery of a controlled substance in case number 12 CR 0665901.

¶ 30    During closing arguments, defense counsel argued that defendant was only guilty of second degree murder. The court inquired what circumstances made second degree murder appropriate. Defense counsel cited Fiedler's testimony that the shooting occurred in a dangerous neighborhood, and argued this affected defendant's state of mind. The court interjected that nonviolent people, including two or three judges at the court, also lived on the west side of Chicago. The court further questioned whether there was "any evidence that the [N]ew [B]reeds previously had been violent" towards defendant. Counsel replied that Wilson was in a street gang that operated in the neighborhood, and defendant's knowledge of gang activity was relevant to assess what circumstances he believed existed. In response, the court said, "First Mayor Daly [*sic*] was in a street gang. What are you telling me?" Defense counsel concluded by arguing that the evidence proved a mitigating factor because the "[t]otality of the circumstances" showed it was "reasonable"

for defendant to believe Wilson posed a threat, although it was later revealed "that belief was unreasonable" because Wilson was not found with a firearm.

¶ 31    In rebuttal, the State emphasized that defendant and his family were not in danger once the fight ended, defendant fired multiple times while Wilson fled, and "mere words" are "not enough to present a mitigating factor."

¶ 32    The court found defendant guilty on all counts. In so holding, the court stated it was "amazing" that defendant "wants the court to believe that he was acting reasonably in *** interpreting that he was in danger," in part because defendant did not observe Wilson with a firearm and "no reasonable interpretation" of the facts suggested Wilson was armed. The court believed the "preponderance of the evidence" did not establish that "anybody was at risk," even if defendant found it "necessary" and "reasonable just of nature" to fire at Wilson "almost a dozen times" when Wilson reached for an article of clothing. Instead, the court found that defendant committed "cold blooded murder" by shooting Wilson in the back of the neck and there was nothing "reasonable in this court's assessment." According to the court, Wilson's murder was "senseless," and it was "insulting" that defendant "would suggest that he was in fear of anything" when there was "absolutely no evidence *** of any mitigating factor."

¶ 33    The court denied defendant's motion for a new trial. After a hearing, the court merged all charges into count VI and sentenced defendant to 50 years' imprisonment. The court then granted defendant's motion to reconsider sentence and reduced his sentence to 45 years' imprisonment.

¶ 34    On appeal, defendant first argues that his conviction should be reduced to second degree murder because he established the mitigating factor of unreasonable belief in self-defense.

¶ 35    Relevant here, a defendant is guilty of first degree murder when he or she kills an individual "without lawful justification," and in doing so, (1) "either intends to kill or do great bodily harm to that individual or another, or knows that such acts will cause death to that individual or another," or (2) "knows that such acts create a strong probability of death or great bodily harm to that individual or another." 720 ILCS 5/9-1(a)(1), (2) (West 2014). A defendant commits second degree murder where, in relevant part, the State has proven first degree murder beyond a reasonable doubt, but "at the time of the killing [the defendant] believes the circumstances to be such that, if they existed, would justify or exonerate the killing *** but [the defendant's] belief is unreasonable." 720 ILCS 5/9-2(a)(2) (West 2014).

¶ 36    One such justifying circumstance is self-defense. *People v. Jeffries*, 164 Ill. 2d 104, 113 (1995). In order to prove self-defense, a defendant must show:

> "(1) force is threatened against a person, (2) the person is not the aggressor, (3) the danger of harm was imminent, (4) the threatened force was unlawful, (5) the person actually and subjectively believed a danger existed that required the use of the force applied, and (6) the person's beliefs were objectively reasonable." *People v. Washington*, 2012 IL 110283, ¶ 35.

Second degree murder is referred to as "imperfect self-defense" because the offender's belief is not objectively reasonable. *People v. Castellano*, 2015 IL App (1st) 133874, ¶ 148. Once the State has proven the defendant guilty of first degree murder, the burden shifts to the defendant to establish the remaining five elements of self-defense by a preponderance of the evidence. *Id.* at ¶ 154 (citing *People v. Thompson*, 354 Ill. App. 3d 579, 586 (2004)). If the defendant makes this

showing, the burden shifts to the State to disprove any of those elements beyond a reasonable doubt. *Thompson*, 354 Ill. App. at 586.

¶ 37 Whether the defendant has established imperfect self-defense is a question of fact. *Castellano*, 2015 IL App (1st) 133874, ¶ 143. The standard of review on appeal is whether, "viewing the evidence in light most favorable to the prosecution, any rational trier of fact could have found that the mitigating factors were not present." *People v. Blackwell*, 171 Ill. 2d 338, 358 (1996). The factfinder is "not obligated to accept a defendant's claim of self-defense; rather, in weighing the evidence, the trier of fact must consider the probability or improbability of the testimony, the circumstances surrounding the killing and the testimony of other witnesses." *People v. Rodriguez*, 336 Ill. App. 3d 1, 15 (2002). In a bench trial, the factfinder makes all credibility determinations. *People v. Bradford*, 2016 IL 118674, ¶ 12. Because "it is the responsibility of the trier of fact to resolve conflicts in the testimony, weigh the evidence, and draw reasonable inferences from the facts," the reviewing court "will not substitute its judgment for that of the trier of fact on questions involving the weight of the evidence or the credibility of the witnesses." *People v. Gray*, 2017 IL 120958, ¶ 35.

¶ 38 Defendant contends that he established imperfect self-defense because the evidence shows Wilson threatened to use unlawful force against defendant and his family such that defendant subjectively believed deadly force was necessary, though that belief was unreasonable. The trial court, however, rejected defendant's evidence on two elements of imperfect self-defense, namely the imminence of the threat and whether defendant actually and subjectively believed a danger existed that required the use of deadly force.

¶ 39    The evidence showed that defendant was the only person who displayed or discharged a firearm during the incident. Harris, Slater, and Benamon all testified that the fight between Benamon and Wilson did not involve weapons. Both Benamon and defendant testified that they overheard Wilson threaten to "kill" someone, but no one saw Wilson with a weapon at any point. The witnesses agreed that the fight had concluded and Benamon was walking away when defendant opened fire at Wilson. Wilson never touched defendant or threatened him with a weapon. After the first shot, Wilson began to run away, but defendant pursued him and continued to fire until Wilson fell. Defendant testified that he continued to fire because he was afraid Wilson would turn around and shoot him.

¶ 40    Based on this record, we hold that a rational factfinder could have found defendant failed to prove imperfect self-defense by a preponderance of the evidence. First, the fact that defendant never saw Wilson with a weapon negates the imminence of the purported threat. In *People v. Babbington*, 286 Ill. App. 3d 724 (1997), this court rejected the defendant's argument that he shot the victim due to an imminent threat of the victim pistol whipping him because the evidence showed the victim's firearm was in his pocket, not his hand. *Babbington*, 286 Ill. App. 3d at 731. Here, there was no indication that Wilson had a weapon at all, and based on this fact, a rational court could find that defendant did not face an imminent threat. See *People v. Robinson*, 375 Ill. App. 3d 320, 336-37 (2007) (the jury was "practically compelled" to find threat was not imminent in part because defendant never saw a firearm and the victim never showed a firearm). Defendant points to his and Benamon's testimony that Wilson made verbal threats, but verbal threats alone are insufficient to justify the use of deadly force. See *People v. Chatman*, 102 Ill. App. 3d 692, 699 (1981) (victim grabbing defendant's collar and threatening to harm him before walking away

insufficient to justify deadly force); see also *People v. Ranola*, 153 Ill. App. 3d 92, 99 (1987) ("[t]hreats or words do not justify the use of force").

¶ 41 A rational factfinder could also conclude that defendant did not have a subjective belief that deadly force was necessary to protect himself or his family. Defendant testified that he believed Wilson was retrieving a firearm, but in self-defense matters, the factfinder makes its own credibility determinations and is not required to accept the defendant's representations. See *Rodriguez*, 336 Ill. App. 3d at 15. Here, it was within the court's discretion to find that defendant did not have a subjective belief that a danger existed that required deadly force based on the evidence that the fight had ended and Wilson never had a weapon. The court could also credit defendant's own testimony that he continued to fire as Wilson ran away, a fact corroborated by Slater, as evidence negating that defendant subjectively believed he needed to use deadly force to defend himself or his family. See *People v. Cunningham*, 212 Ill. 2d 274, 283 (2004) (factfinder has discretion to accept some parts of a witness's testimony while rejecting others).

¶ 42 The court was also free to reject the testimony that defendant's subjective belief was influenced by Wilson's alleged membership in the New Breeds gang, the New Breeds' alleged reputation, and the alleged reputation of the neighborhood. *Blackwell* is instructive on this point. There, the defendant fired at a group of men identified as members of the Latin Kings gang following a fight between the men and an acquaintance of the defendant. *Blackwell*, 171 Ill. 2d at 344-46. The fight had ended, and the acquaintance was walking away when the defendant opened fire. *Id.* at 345. The alleged gang members did not draw weapons. *Id.* The defendant testified that he carried a firearm that night because he knew there was gang activity in the area, and he discharged that firearm because he was concerned the victims would have weapons with them. *Id.*

at 345-46. The court rejected the defendant's imperfect self-defense argument, citing the facts that the "fight between [the defendant's acquaintance] and the victims was a fist fight and did not involve weapons," defendant fired "when the victims were facing away," and "[n]o threats or hostile gestures had been made towards defendant." *Id.* at 359. Similarly, the court here could rationally find that the specific circumstances established defendant did not have a subjective belief that force was necessary to protect himself or another, regardless of the general circumstances of Wilson's alleged gang membership and the reputation of the gang and neighborhood.

¶ 43   Defendant posits that certain comments by the trial court show that it failed to adequately consider the evidence of his unreasonable belief in self-defense. Defendant notes that the court said it was "insulted" that defendant would argue "he was in fear of anything." He further suggests that the court reacted inappropriately to defense counsel's argument regarding the reputation of the neighborhood and Wilson's alleged gang membership by interjecting that current judges live on the west side of Chicago, and that Mayor Daley was "in a street gang." Counter to defendant's argument, the colloquy reveals that the court appropriately considered defendant's testimony that his subjective belief was influenced by the reputation of the neighborhood and by Wilson's alleged gang membership, and rejected it as incredible. This was within the discretion of the trial court. See *Gray*, 2017 IL 120958, ¶ 35.

¶ 44   Defendant next argues that the court applied an incorrect legal standard to determine whether he established imperfect self-defense. Specifically, defendant argues the court believed that for purposes of second degree murder, he had to prove his belief in the need for deadly force was reasonable. In support, defendant points to the court's observation that defendant claimed to have found it "necessary" and "reasonable" to shoot Wilson multiple times despite never seeing a

weapon, as well as the court's comments that there was nothing "reasonable in this court's assessment."

¶ 45    A trial court "is presumed to know the law and apply it properly. However, when the record contains strong affirmative evidence to the contrary, that presumption is rebutted." *People v. Howery*, 178 Ill. 2d 1, 32 (1997).

¶ 46    We find that the record does not contain strong affirmative evidence that the trial court applied an incorrect legal standard. The court's comments during closing argument and its findings as a whole demonstrate that the court appropriately analyzed the evidence under the framework of self-defense and found defendant did not prove he had an unreasonable belief in self-defense by a preponderance of the evidence. See *Thompson*, 354 Ill. App. 3d at 586. This was a proper application of the law.

¶ 47    In sum, the court applied the correct legal standard and rationally decided that defendant did not prove the mitigating factor of imperfect self-defense by a preponderance of the evidence. His conviction is thereby affirmed.

¶ 48    Affirmed.