No. 2--06--0037    Filed: 7-23-07

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Lake County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 02--CF--1305 |
| MICHAEL D. ROBINSON, | ) ) | Honorable Victoria A. Rossetti, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE BOWMAN delivered the opinion of the court:

Defendant, Michael D. Robinson, appeals the summary dismissal of his petition for relief under the Post-Conviction Hearing Act (Act) (725 ILCS 5/122--1 et seq. (West 2004)). Defendant contends that his petition states the gist of a meritorious claim that his trial and appellate counsel were ineffective for failing to argue that the trial court denied defendant due process by requiring him to wear leg shackles during his trial. We affirm.

Defendant was charged with the murder (720 ILCS 5/9--1(a) (West 2002)) of Geoffrey DuPont, a coworker at a Meineke Muffler shop in Wauconda. Defendant claimed self-defense (720 ILCS 5/7--1 (West 2002)) and, alternatively, second-degree murder based on an unreasonable belief in the need for self-defense (see 720 ILCS 5/9--2(a)(2) (West 2002)). A jury convicted defendant, and he was sentenced to 38 years' imprisonment. On direct appeal, we affirmed. People v. Robinson, No. 2--02--1171 (2004) (unpublished order under Supreme Court Rule 23).

Defendant filed a pro se petition for relief under the Act, alleging that (1) his appellate counsel was ineffective for failing to argue that the trial court erred by shackling defendant during trial; and (2) his trial counsel was ineffective for failing to object to the shackling, insist on a hearing on the matter, or move for a mistrial. Defendant's petition did not attach affidavits but relied on the trial record. We summarize the pertinent parts of the record.

On May 1, 2002, defendant was indicted. On the morning of August 19, 2002, before jury selection began, he appeared in court with his attorneys, Gregory Ticsay and Neil Takiff. The following exchange occurred:

"MR. TICSAY: Can we have his leg shackles removed?

THE COURT: No.

THE DEPUTY: Either give him a regular chair or push him in all the way and they won't see anything. As long as he is tucked in all the way they can't see anything.

THE COURT: That is right.

You are afraid somebody can see him?

MR. TICSAY: That is my concern at some point in time the jurors or prospective jurors will see him with leg shackles.

THE COURT: I have been doing these trials in these courtrooms.

THE DEPUTY: I will be sitting directly behind him and his lawyers will be around. They can't see nothing [sic].

THE COURT: You can't see it in here; you can't see it from the jury box, can you?

MR. TICSAY: Not perhaps from the jury box, but the way the courtroom is situated prospective jurors will be seated behind him before they are selected. They might have an opportunity as they come in to look down and see his leg shackles.

THE COURT: I am not having his leg shackles removed. I have been doing this for 17 years and the same layout. We haven't had a problem. You think somebody can see it[,] we will use a different courtroom.

MR. TICSAY: Should he choose to testify, will they be removed at that point?

THE COURT: I suppose. They will be removed when he is up in the witness box.

THE DEPUTY: We can sit him in all the way and put a towel on his feet. You won't be able to see.

THE COURT: He is fine. This is not a problem. If he testifies he will take them off."

The foregoing is the first reference in the record to the shackling of defendant. The record does not disclose when the trial judge decided that defendant would be shackled or why the judge believed that shackling was proper.

At 1:30 p.m., the court took a recess. When the court reconvened, Ticsay stated that, around 1:35 p.m., the court had cleared the jurors from the courtroom before defendant was brought in. The trial judge agreed and added, "He is now seated. His handcuffs are off. His legs that do have a thing between them are under the table and there is a monitor in front of the table."

After the jury and alternates had been selected, the following exchange ensued:

"MR. TICSAY: Around 3:55, one of the jurors who is now seated on the jury, Juror 291, did walk into the courtroom while Mr. Robinson was standing in his shackles. They

were allowing him to stretch his legs. She came in briefly. The deputy ushered her back out and the security officer attempted to block her view. We have no way of knowing at this point whether or not she did, in fact, see him in the shackles. I wanted that on the record.

THE COURT: I appreciate that information.

Deputies, can't [sic] have the jurors seeing the defendant move around or in any position other than seated behind the desk.

Where was he standing? Like he is now?

MR. TICSAY: That's correct.

THE COURT: Right up against the desk.

MR. TICSAY: Maybe standing back from the table. Just for the record as well, the deputy did lock the door and the [assistant] State's Attorneys walked out, I believe, to use the restrooms and the door did not close tightly behind them. I think that is why the door was not secured."

Trial began on the morning of August 20, 2002. Because the resolution of this appeal depends in part on the closeness of the evidence, we summarize the pertinent testimony in some detail. The State's first witness, Julie DuPont (Julie), testified as follows. On the morning of April 12, 2002, she drove DuPont, her husband, to the Meineke shop. At about 5 p.m., she returned to pick him up. After sitting in her car for 10 minutes, she saw defendant, who told her that DuPont had driven away in a red Cavalier at 4 p.m. Julie was confused because her friends owned a red Cavalier, but it did not run. At about 5:50 p.m., Julie drove to a parking lot across from the Meineke

shop and sat there. She saw defendant back his truck into a service bay, exit the truck, and walk to the back of the truck. Seeing no sign of DuPont, Julie drove off.

Julie testified that DuPont did not own a gun. She was not aware that he had a cocaine habit.

Fox Lake police officer Kenneth Welsch testified that, at about 10:30 p.m. on April 12, 2002, he and several other officers responded to a call about a possible homicide. Arriving at the corner of Linden and Lake, he saw defendant and two other men in the driveway at 21 Linden. Defendant's truck was across the street. The officers patted down the three men and found no guns. Welsch arrested defendant and read him his rights. Before defendant was driven to the police station, he spontaneously told Welsch that he had tried to clean up the Meineke shop but may not have removed all the blood. While riding to the station, defendant volunteered that he did not mean to kill DuPont.

Several witnesses described what they saw in a barrel that was in the bed of defendant's truck outside 21 Linden on the evening of April 12, 2002. Ed Lescher, a firefighter and paramedic, testified that underneath some refuse and bloody towels was DuPont's body, folded up with the head near the feet. The top of DuPont's skull had three depressed fractures, and brain matter was hanging out. His nose and mouth were duct taped. Michael Ostertag, a Fox Lake patrol officer, testified that DuPont had received severe trauma to the skull and that duct tape covered DuPont's face and ears. Jeffrey Norris, an evidence technician, identified a plastic bag that he recovered from the truck bed. On the bag, written in black ink, was "deep throt [sic]." Also in the truck bed was a work shirt that was missing a name tag that was later found in a drawer in the Meineke shop.

Wendy Frazier testified that, in April 2002, she worked at Duke's, a bar in Wauconda, and lived with her fiancé and defendant in Island Lake. On April 12, 2002, at about 6 p.m., she left a

message on defendant's voice mail at work, asking him to join her at Duke's. At about 6:15, he called and accepted. Five minutes later, he arrived, and they each had a beer. After defendant talked to some other people, he drove Frazier home. She saw a barrel in the back of his truck.

Scott Mayenschein testified that he worked next door to the Meineke shop. On April 12, 2002, at about 3:15 p.m., he borrowed some tools from Steve Caldararo, the manager. When he returned the tools at about 3:45 p.m., he saw defendant and DuPont working together amicably. At about 7:30 or 8 p.m., defendant showed up at Mayenschein's house, talked with him, and drove off. At about 10:30 p.m., defendant and Caldararo drove up in defendant's truck. Soon afterward, the police arrived.

Dr. Eupil Choi, who performed the autopsy on DuPont on April 13, 2002, testified as follows. Duct tape had been wrapped around DuPont's head about five times, so tightly that it would have prevented air from entering his nose or mouth. DuPont's head had three blunt-trauma lacerations, one in the back. Had DuPont been sitting up or standing up straight, the injury to the back of his head would have been inflicted from either the side or behind, not by someone facing him. There were no defensive wounds on DuPont's hands. An internal examination revealed three holes in his skull and damage to brain tissue. His throat was obstructed by a plastic bag that could not be seen by looking into his mouth and measured 11 inches by 17 inches. Although the autopsy report gave the immediate cause of death as cranial cerebral injuries, Choi opined that the obstruction of DuPont's breathing passages would also have caused death. Toxicological tests proved that DuPont had used cocaine, but that was irrelevant to the cause of death.

Jack Rabey, an evidence technician with the Vernon Hills police department, testified that, on April 12 and 13, 2002, he inspected the Meineke shop. Blood was on the floor of the service bay area, on a bench, a chair, and a toolbox, and under an air compressor. However, there was no blood on the main shop floor, which had been cleaned recently. Some skull fragments were underneath the air compressor, and a sledge hammer was on top of a tool box on the wall. Steven Jones, another evidence technician, saw dry stains on the chair and skull bone fragments on the floor near the work bench. A search of the Meineke shop did not uncover firearms of any sort.

After the jury retired on August 20, 2002, the State indicated that its case was complete, and the trial judge told defendant's counsel to advise him the next day whether defendant intended to testify. The following exchange ensued:

"MR. TICSAY: Then when he is done testifying, will he be permitted to walk back to the table?

THE COURT: We will have the jurors leave, the jurors will go out. We will take a recess.

MR. TICSAY: That is over our objection.

THE COURT: That is fine."

On the morning of August 21, 2002, before the jury was seated, the trial judge examined defendant and ascertained that he wished to testify. The following colloquy ensued:

"[THE COURT]: This is what I propose. I propose what we do is we have the defendant go up to the witness stand, take off his leg--I don't know a better word than shackles. They are not exactly shackles, but his legs are connected by some wire or

something, remove that when he is seated up there and then bring the jurors in. When he is done testifying then we will take the jurors out and put Mr. Robinson back in his seat by his lawyers. To do that though we do need some other things.

Deputy, you can tell me when we have other deputies.

THE DEPUTY: One is coming up for sure.

THE COURT: Officer, we can have Mr. Robinson come up to the witness stand. You can take his--

THE DEPUTY: Those are called leg shackles. What he wears around his waist is a body belt.

THE COURT: Thank you very much. This deputy can either be stationed by that door or outside the back of this door ***."

The jury was brought in, and the State formally rested. Defendant then testified on direct examination as follows. He was employed at the Meineke shop when DuPont started there in March 2002. Defendant used cocaine, and DuPont began to supply him with the drug for $50 at a time. Asked whether DuPont gave him his money's worth, defendant testified that DuPont "kind of overloaded it a little bit because he said he liked me." Defendant paid DuPont about $400 in all, but soon he decided to quit because it was hurting his work and his personal life.

On April 12, defendant was late for work and received a written warning, his second one. At about 4:30 p.m., defendant told DuPont that he had to give up cocaine, which meant that he would probably need to stop being around DuPont. DuPont responded that, in that case, defendant

would have to pay for the extra cocaine that DuPont had given him. Defendant replied that he did not have the money. Then, according to defendant:

"A. He said that he would show me a gun and shoot me.

Q. Did he say anything else to you about that?

A. He added that if I tried to stop him *** he would kill me and later on if I had told on him and got him arrested that he would have somebody else shoot me. That is when I hit him with the hammer."

As DuPont was talking, defendant took the hammer off his toolbox, looked at DuPont, and said, "You are going to kill me." DuPont was standing three feet away. Defendant swung the hammer and hit DuPont in the left side of the head. DuPont sat down in a chair, said nothing, and started raising his arms. Defendant swung, apparently missing, but then hit DuPont again. DuPont was "kind of lifeless." In all, defendant hit DuPont three times with the hammer, the last two times while DuPont was seated. After the third blow, defendant went to the sink across the room, washed the blood off the hammer, returned, and saw that DuPont was bleeding all over the floor.

Defendant did not know what to do. He did not call the police, because he was afraid that they would not believe him. He got a plastic bag to stop DuPont's bleeding, but "it didn't look as though he was dead so I crumbled [sic] it and put it in his mouth." Defendant tried to hide the bag because he was afraid that his fingerprints would give him away. Defendant then noticed duct tape nearby. Because he "wanted to hide [DuPont's] face," he "tied his face" with the tape. Defendant went to change his clothes. The phone rang, but when defendant answered, he got no response.

Defendant returned to DuPont and realized that "there was no way to hide him," so he got a barrel and put the body inside. Defendant dumped some trash and a jacket on top of the body and cleaned up blood from the shop floor. Noticing Julie's car out front, he rolled something in front of the barrel and pretended to sweep. Julie asked where DuPont was, and defendant said that DuPont had left earlier. Julie left, and defendant closed up the shop, first removing the name tag from his shirt and putting the shirt into the barrel. Defendant put the barrel into the bed of his truck and sat in the truck for a while. He drove off.

Frazier called on defendant's cell phone and invited him to Duke's. He went because Frazier needed a ride home. After spending a few minutes at the bar talking with friends, he drove Frazier home. Soon afterward, he drove back to the Meineke shop, then to Mayenschein's home, thinking that he might tell him about DuPont. However, he merely asked Mayenschein where to dump his trash and, at Mayenschein's suggestion, drove to the Meineke shop. Deciding to tell Caldararo about DuPont, he picked him up. They rode to Mayenschein's, where Caldararo had an errand. Defendant told Caldararo about DuPont, and, with defendant's consent, Caldararo called the police. After defendant was arrested and taken to the station, he provided written and videotaped statements.

Defendant testified that, when DuPont threatened him on April 12, 2002, DuPont did not show him a gun. At no time that day did defendant see a gun in DuPont's possession. However, on an earlier date, defendant had been at DuPont's house buying narcotics and DuPont offered to show him his gun. Defendant declined. Another time, when they were at defendant's home using drugs, DuPont told defendant that he kept his gun by his bed to help him "sleep and stuff."

Defendant testified as follows on cross-examination. On the morning of April 12, 2002, DuPont told Caldararo that defendant was tardy. A week earlier, defendant had been written up for tardiness, also after DuPont told Caldararo. When Mayenschein dropped by, defendant and DuPont were working together cooperatively. When defendant later told DuPont that he was giving up cocaine, DuPont was sitting in a chair, off to defendant's left, but stood up at some point before defendant swung the hammer at him. When defendant first swung, DuPont ducked, but defendant then hit him in the left side of the head, knocking him into the chair. Asked about the two blows that followed, defendant testified, "I wasn't thinking of hitting him again. It just happened."

Defendant testified that, after the third blow, he got the plastic bag to stop DuPont's bleeding, but then decided to hide the bag by putting it into DuPont's throat. He could not explain why he thought the bag would be incriminating or why he could not just have discarded it. He also testified that he taped DuPont's head in order to hide the killing, but he could not explain how it would do so. He wrote "deep throt [sic]" on a piece of another plastic bag and put the piece into the truck "so somebody would know it was in there." Defendant admitted that he told the police that DuPont never showed him a gun. He told them that DuPont said that he had "access" to a gun. On redirect examination, defendant stated that, on April 12, 2002, he knew that DuPont's gun was not at the Meineke shop, "[b]ut it didn't cross my mind." He did not wait to see whether DuPont would pull a gun, because if "[s]omebody has a gun and I don't have one you pretty much lose."

Defendant rested. The court reconvened in the afternoon. In closing argument, the State contended that the evidence showed that defendant attacked DuPont by surprise in retaliation for twice reporting him late for work and thus threatening his job. The State noted that DuPont suffered

no defensive wounds, demonstrating the suddenness of defendant's attack, and that defendant's acts went far beyond what would be associated with self-defense: he not only beat DuPont three times with the hammer, but also wound duct tape around his face so tightly that it cut off his breathing, stuffed a large plastic bag deep into DuPont's throat with a similar effect, and wrote "deep throt [sic]" on a plastic bag, apparently referring to the well-known informant in the Watergate scandal. The State also contended that defendant's story of self-defense and panic was undercut by his calculated attempts to hide the crime and his calm behavior at Duke's shortly afterward. Defendant's counsel argued that the killing was not premeditated, as defendant feared that he would be killed for a drug debt and did not want to "wait and see if [DuPont] had the gun with him." In rebuttal, the State noted that premeditation was not an element of the murder charge and that self-defense required an imminent threat of harm. That evening, the jury found defendant guilty of first-degree murder.

Defendant moved for a new trial, but his motion did not contend that the court erred by shackling him. The court denied the motion, sentenced defendant to 38 years' imprisonment, and declined to reconsider the sentence. On appeal, defendant did not argue that the trial court erred in shackling him or that trial counsel was ineffective. We rejected his contentions that the prosecutor's closing argument denied him a fair trial and that the sentence was excessive, and we affirmed. People v. Robinson, No. 2--02--1171 (2004) (unpublished order under Supreme Court Rule 23).

Defendant filed a pro se petition for relief under the Act. The petition contended first that appellate counsel was ineffective for failing to argue that the trial court denied defendant due process by shackling him during trial without a hearing to determine whether special circumstances warranted the extraordinary measure. According to the petition, while it was unclear whether

-12-

defendant's shackles were visible from the jury box, juror No. 291 probably did see them on August 19, 2002, and the existence of the restraint itself made it harder for defendant to assist in his own defense. The petition contended second that trial counsel was ineffective for failing to object to the shackling, move for a hearing on whether the shackling was necessary, or move for a mistrial based on the shackling. The trial court dismissed the petition, and defendant timely appeals.

On appeal, defendant contends that his petition states the gist of meritorious claims that his appellate counsel was ineffective for failing to argue that the shackling violated due process and that his trial counsel was ineffective for accepting the trial court's decision without moving for a hearing on whether shackling defendant was proper. For the reasons that follow, we affirm.

At the preliminary stage, a petition under the Act need present only the gist of a meritorious claim. People v. Gaultney, 174 Ill. 2d 410, 418 (1996). All well-pleaded factual allegations in the petition must be taken as true. People v. Williams, 364 Ill. App. 3d 1017, 1022 (2006). However, the trial court may consider the petition's allegations in light of the trial record and may dismiss the petition if the record contradicts those allegations. 725 ILCS 5/122--2.1(c) (West 2004); People v. Ramirez, 371 Ill. App. 3d 738, 743 (2007). Our review is de novo. Ramirez, 371 Ill. App. 3d at 743.

To succeed on a claim that trial counsel was ineffective, a defendant must show both that counsel's performance was objectively unreasonable (Strickland v. Washington, 466 U.S. 668, 688, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064 (1984)) and that it is reasonably probable that, but for counsel's unprofessional errors, the result of the trial would have been different (Strickland, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068; People v. Williams, 368 Ill. App. 3d 616, 622 (2006)). Similarly, to succeed on a claim that appellate counsel was ineffective, a defendant must

show that counsel's failure to raise an issue on appeal was objectively unreasonable and that the failure prejudiced the defendant. People v. Jones, 219 Ill. 2d 1, 23 (2006).

We resolve both claims by holding that defendant's petition did not sufficiently allege the prejudice needed for a successful claim of ineffective assistance of counsel. At this preliminary stage, there is arguable merit to the petition's contention that the trial court erred in shackling defendant without a hearing or a statement of reasons. However, the record shows that it is not reasonably probable that either the trial or the appeal would have turned out differently had trial counsel performed more adeptly, and thus neither trial counsel nor appellate counsel was ineffective.

The heart of defendant's argument is a due process violation. The visible shackling of a defendant during the guilt phase of his trial violates due process unless the prosecution can show that the shackling is justified in the particular case by an essential state interest. Deck v. Missouri, 544 U.S. 622, 624, 161 L. Ed. 2d 953, 959, 125 S. Ct. 2007, 2009 (2005). A defendant need not demonstrate actual prejudice to establish a due process violation where a court orders a defendant to wear shackles that will be seen by the jury without adequate justification. Deck, 544 U.S. at 635, 161 L. Ed. 2d at 966, 125 S. Ct. at 2015. The burden then shifts to the State, which must prove " 'beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained.' " Deck, 544 U.S. at 635, 161 L. Ed. 2d at 966, 125 S. Ct. at 2015-16, quoting Chapman v. California, 386 U.S. 18, 24, 17 L. Ed. 2d 705, 710, 87 S. Ct. 824, 828 (1967). Moreover, even when there is no danger of improperly influencing the jury (for instance, when the restraints are concealed or when the defendant has a bench trial), shackling should be avoided absent special circumstances, such as the danger that the defendant may threaten the safety of others, try to escape,

or disrupt the proceedings. People v. Urdiales, No. 98996, slip op. at 48 (2007); People v. Allen, 222 Ill. 2d 340, 346 (2006). Aside from the danger of prejudicing the jury, shackling is disfavored because it may restrict the defendant's ability to assist counsel and may offend the dignity of the judicial process. Urdiales, slip op. at 48.

Because shackling a defendant during trial is presumptively improper, the court may not do so unless it places its reasons on the record and gives defense counsel an opportunity to offer reasons why the defendant should not be shackled. Urdiales, slip op. at 48; People v. Buss, 187 Ill. 2d 144, 216 (1999). Only by doing so can the court enable a reviewing court to decide whether the shackling was an abuse of discretion. Urdiales, slip op. at 48; People v. Boose, 66 Ill. 2d 261, 267 (1977).

Here, the trial court did not take the required precautions before it ordered defendant to wear leg shackles and a "body belt"[1] during trial. The court did not hold a hearing or provide defendant's counsel an opportunity to argue against shackling defendant. Moreover, the court never explained on the record why it ordered defendant shackled during trial. Of course, the court's failure to follow these procedures can be explained partly by defense counsel's failure to request the mandatory

---

[1]The record does not describe the "body belt," to which we have uncovered only one reference (by the deputy on the morning of August 21, 2002). It may have been an "electronic stun belt" similar to the one that Allen makes subject to the same restrictions as shackles. See Allen, 222 Ill. 2d at 346-47. While we do not presume that this is so, it is a fair assumption that the "body belt" was a restraint of some type and that the reason that the record does not disclose the nature of this device is that defendant's counsel never sought a hearing at which such information could be obtained.

hearing and the mandatory findings. But, as defendant's petition alleges that his trial counsel was ineffective for precisely these reasons, the trial court's omissions are no less serious.

The record does contain some evidence of factors that the trial judge <u>may</u> have considered in deciding to require defendant to wear restraints during trial. The first is the seriousness of the charged offense. See <u>Allen</u>, 222 Ill. 2d at 347. Obviously, first-degree murder is a serious charge. However, if this was the sole basis for shackling defendant, it was insufficient. In <u>Boose</u>, the sole justification provided for shackling the defendant was that he had been charged with murder. The supreme court held that more was required, as otherwise practically anyone accused of a violent crime could be required to wear shackles during trial. <u>Boose</u>, 66 Ill. 2d at 267; see also <u>Urdiales</u>, slip op. at 48-49 (shackling generally requires more than one reason).

Second, a document of undisclosed provenance, filed in the trial court on April 15, 2002, states that, in 1988, defendant was charged in Nevada with carrying a concealed weapon and, in 1990, also in Nevada, with resisting arrest. This document might have supported restraining defendant at trial, because his record was a pertinent consideration. See <u>Boose</u>, 66 Ill. 2d at 266-67. However, the vague document was not subject to adversarial testing, and other evidence severely undercuts its force. The presentencing investigation report (PSIR) reveals that, in 1990, the weapon charge was reduced to attempted carrying a concealed weapon, for which defendant received one day in jail and was fined. Also, in 1991, the charge of resisting arrest was dismissed, and defendant was sentenced to three years' probation for a drug offense. In 1993, the State of Nevada petitioned to revoke his probation, and a no-bond warrant was issued "due to the defendant absconding from probation." While a defendant's past escapes are a pertinent consideration (see <u>Boose</u>, 66 Ill. 2d at

266-67), the "absconding" occurred about nine years before defendant was charged in this case. The PSIR shows that the prior charges of which defendant was convicted were neither numerous nor violent.

The record does not allow us to infer a justification for shackling defendant. In any event, had defendant's appellate counsel raised the issue, we could not have affirmed merely on the basis that evidence existed to support the trial court's decision. A proper hearing, with an opportunity for defendant's trial counsel to produce contrary evidence, followed by a statement of reasons, would still have been required.

The record strongly suggests, if it does not conclusively demonstrate, that the trial court erred in shackling defendant without holding a hearing or providing reasons on the record. As a result, we conclude that defendant's petition raises the gist of a meritorious argument that his trial counsel acted unreasonably in acquiescing in the trial court's decision instead of insisting on the legally required hearing. We can see no strategic reason (and the State offers none) for trial counsel to forgo the hearing. Defendant would have had "nothing to lose but his chains." Indeed, trial counsel made several comments implying that the shackling could harm defendant and should be minimized.

We recognize that trial counsel was far from totally passive on the issue. For example, counsel expressed concern with whether defendant's shackles would be visible from the jury box and, at one point, with whether one juror had actually seen the shackles. However, counsel's concerns were generally limited to the visibility of the shackles and did not address whether the shackling itself was impermissible. Counsel never requested a hearing or a statement of reasons on the record, even though defendant was clearly entitled to these due process protections. Therefore,

under the "gist" standard, which is a "low threshold" (Gaultney, 174 Ill. 2d at 418), defendant's claim of ineffectiveness satisfies the first prong of the Strickland test, at least as applied to trial counsel.

The second prong of the Strickland test is whether there is a reasonable probability that, but for counsel's mistakes, the outcome of the trial would have been different. Moreover, if the petition does not satisfy the prejudice prong as applied to trial counsel, it also fails to satisfy either prong of the Strickland test as applied to appellate counsel. If appellate counsel reasonably concluded that no prejudice resulted from the shackling of defendant, or from trial counsel's failure to demand due process protections against the shackling, then appellate counsel did not act unreasonably in declining to raise the issue. See Jones, 219 Ill. 2d at 23 (appellate counsel may refrain from developing nonmeritorious issues, without violating Strickland). Furthermore, if it is not reasonably probable that the shackling affected the outcome of the trial, then appellate counsel's decision not to raise the issue did not affect the outcome of the appeal. Therefore, to decide whether defendant's petition satisfies the Strickland test as applied to either his trial counsel or his appellate counsel, we must determine whether the petition states the gist of a meritorious argument that the shackling prejudiced him. We hold that it does not.

While the trial court and trial counsel failed to ensure that defendant's shackling was adequately justified, defendant's claim still fails because (1) it is questionable whether the jury actually saw defendant's shackles and (2) the State has proven beyond a reasonable doubt that the verdict obtained was not due to the shackling. As stated, we address defendant's due process claim under Deck within the Strickland framework. The improper shackling of a defendant may be harmless error. See People v. Strickland, 363 Ill. App. 3d 598, 605 (2006); People v. Kennedy, 150

Ill. App. 3d 319, 326 (1986). For the two stated reasons, we conclude that the shackling of defendant was harmless error and that, as a result, trial counsel's shortcomings did not prejudice defendant.

The first reason is the dearth of evidence that the shackling itself affected the proceedings, either by prejudicing the jury against defendant or by interfering with his ability to cooperate with his attorneys. The Deck court expressly stated that a defendant's due process rights are violated by visible restraints. Deck, 544 U.S. at 632, 161 L. Ed. 2d at 964, 125 S. Ct. at 2014. As regards jury prejudice, the record shows that the trial judge took considerable steps to ensure that the jurors did not see defendant's shackles, which apparently were not particularly obtrusive--the judge described them as "not exactly shackles, *** but some wire or something." At the August 19, 2002, hearing preceding jury selection, the judge and the deputies agreed that, as long as defendant was "tucked in all the way," the jurors could not see defendant's shackles. Defendant's attorney essentially conceded that the shackles were not visible from the jury box. Although counsel expressed concern that the jurors might see the shackles from some other angle, the judge specifically noted that he had been trying cases in the courtroom for 17 years and had never had reason for such a concern. After the jury was selected, the judge instructed the deputies to station themselves appropriately and monitor the proceedings to ensure that no jurors were present when defendant's shackles might be visible.

As defendant concedes, the sole indication in the record that any juror might have seen his shackles is that, on the afternoon of August 20, 2002, after jury selection, defendant's counsel stated that one juror walked into the courtroom while defendant was stretching. However, by counsel's admission, the juror "came in briefly" and was ushered out as a security officer attempted to block

her view. Counsel conceded that he had "no way of knowing" whether or not the juror saw defendant or his shackles. Defendant's petition includes no evidence beyond the trial record, so we still have "no way of knowing" whether the juror so much as caught a glimpse of defendant while he was shackled.

As for cooperation with counsel, there is simply nothing in the record to demonstrate that defendant's shackles in any way impaired his ability to consult with his attorneys or otherwise assist in his defense. Defendant's counsel never suggested any such thing, and it appears that defendant suffered no more than whatever physical discomfort was inherent in the restraints, which the trial judge described as less substantial than conventional leg shackles. Defendant's ability to view and hear the proceedings, or to talk to his attorneys, was unaffected. Therefore, while there is minimal evidence that the shackling may have prejudiced the jury against defendant, there is no evidence that it impaired his ability to assist in his defense. In sum, the record does not suggest that the shackling had a discernible effect on the fairness of defendant's trial.

The second reason that we conclude that any error was harmless is that the evidence of defendant's guilt was overwhelming, as reflected by the speed with which the jury returned its verdict. We recognize that under Deck, inherent prejudice results when a defendant wears shackles, without adequate justification, in the presence of the jury. However, even if the shackles were seen by the jury in this case, the State has met its burden of proving beyond a reasonable doubt that the alleged shackling error did not contribute to the guilty verdict. Defendant conceded that he killed DuPont, and he invoked the affirmative defense of self-defense (see 720 ILCS 5/7--1 (West 2002)) and, alternatively, asked for a verdict of guilty of second-degree murder based on the unreasonable

belief in the need for self-defense (see 720 ILCS 5/9--2(a)(2) (West 2002)). Apparently, the jury rejected defendant's explanation of why he killed DuPont, and, as we shall discuss, it had strong reasons to do so. Equally important, even if the jury accepted defendant's account, the controlling law still all but compelled a verdict of first-degree murder. Put plainly, any other result would have bordered on jury nullification.

A person is justified in the use of force in self-defense against another when and to the extent that he believes that such conduct is necessary to defend himself against the other's imminent use of unlawful force. However, the use of force that is intended or likely to cause death or great bodily harm is justified only if he reasonably believes that such force is necessary to prevent imminent death or great bodily harm to himself or the commission of a forcible felony. 720 ILCS 5/7--1(a) (West 2002); People v. Lee, 213 Ill. 2d 218, 225 (2004). Self-defense is an affirmative defense (720 ILCS 5/7--14 (West 2002)), and, once it is raised, the State must disprove it beyond a reasonable doubt (720 ILCS 5/3--2(b) (West 2002)). Self-defense has both a subjective aspect and an objective one: the defendant must believe that a danger exists that requires the use of the force applied, the belief must be objectively reasonable, and the use of force must actually be necessary. Lee, 213 Ill. 2d at 225.

As pertinent here, a person commits second-degree murder when he commits first-degree murder and, at the time of the killing, he believes the circumstances to be such that, if they existed, would justify or exonerate the killing as self-defense, but his belief is unreasonable. 720 ILCS 5/9--2(a)(2) (West 2002). Although the State must prove beyond a reasonable doubt the elements of first-

degree murder, the defendant must prove, by a preponderance of the evidence, his belief in circumstances that would have justified the killing. 720 ILCS 5/9--2(c) (West 2002).

We conclude that the evidence against defendant's claim of self-defense was overwhelming. First, there was ample evidence from which the jury could conclude that defendant did not actually and subjectively believe that the use of force was necessary. The State's contention that this was a deliberate surprise killing for reasons unrelated to self-defense was well supported. Defendant contended that he killed DuPont out of a fear that DuPont would harm him in retaliation for an unpaid drug debt or if defendant reported DuPont's threat. Yet defendant himself testified that the threat was conditional: DuPont would not harm defendant unless he did not pay for the "extra" cocaine or he got DuPont arrested. Defendant testified that he had paid DuPont about $400 in all, and he described the extra cocaine as DuPont "kind of overload[ing] it a little bit," so it was a fair inference that defendant's debt was small, even for one in his supposedly straitened circumstances.

Also important is how defendant killed Dupont. As the State argued, defendant's methodical and extremely brutal actions militated against his claim of self-defense. Defendant beat DuPont with the sledge hammer three times hard enough to scatter skull fragments onto the floor and expose DuPont's brain, the second and third times after DuPont collapsed into the chair. However, defendant did much more. He wound duct tape around DuPont's head approximately five times, tightly enough to cut off his breathing, and stuffed a large plastic bag so deeply into his throat that it could not be seen by looking into his mouth. In his testimony, defendant could not explain why he needed to hit DuPont a second and third time with the hammer, duct tape his face, or stuff the plastic bag down his throat. Dr. Choi testified that either the hammer blows or the duct taping

sufficed to cause death. Moreover, Dr. Choi testified that DuPont had no defensive wounds and that the hammer blow to the back of the head likely came from the back or the side, implying a planned surprise attack, not a spontaneous response to a threat. The jury could have easily concluded that defendant's systematic and redundant cruelty was not a panic-stricken attempt at self-defense.

Defendant's conduct immediately after he killed DuPont also militated against his story that he acted out of fear for his own life. Although defendant testified that he was not thinking clearly after the killing, the evidence showed that he retrieved a barrel and hid the body, removed and hid the identifying tag off his work shirt, cleaned up much of the blood, washed his hands, placed the body into his barrel along with refuse to conceal it, and concocted a false story to tell Julie when she asked where her husband was. Defendant took the time to write "deep throt [sic]" on a plastic bag, an act that was worthless as self-defense but supported the State's theory that defendant killed DuPont coldly, possibly for informing on him and threatening his job. Also, the jury could infer that defendant showed no great anxiety when he joined Frazier at Duke's, chatted with people there, or looked around for a place to dump the barrel containing DuPont's body.

All of what we have stated so far demonstrates that there was little likelihood that the jury accepted defendant's claim that he acted out of self-defense. Moreover, even if the jury did accept defendant's account of his subjective beliefs when he killed DuPont, it would still have been all but forced to reject his claim. As noted, the use of deadly force in self-defense is not justified in the absence of a need to prevent imminent bodily harm or the commission of a forcible felony. 720 ILCS 5/7--1 (West 2002); Lee, 213 Ill. 2d at 225. In the context of self-defense, "imminent" means "reasonably probable," not merely possible (State v. Payne, 7 S.W.3d 25, 28 (Tenn. 1999)), and

refers not to a future threat but to one that is "present" (Kessler v. State, 850 S.W.2d 217, 222 (Tex. App. 1993)) or "immediate" (Black's Law Dictionary 399 (7th ed. 1999)). See People v. Babbington, 286 Ill. App. 3d 724, 731 (1997) (defendant's claim that he shot decedent to prevent pistol-whipping was refuted by, among other evidence, testimony that decedent had gun in his pocket, not in his hand).

Given these standards, the jury was practically compelled to find that the State proved beyond a reasonable doubt that defendant did not face an imminent threat of bodily harm or the commission of a forcible felony (see 720 ILCS 5/7--1 (West 2002)). By defendant's admission, DuPont never showed him a gun; defendant never saw one; and defendant knew that DuPont did not have a gun with him, although that crucial fact "didn't cross [his] mind" until later. The police found no gun in the Meineke shop, or anyplace else, and Julie testified that DuPont did not even own one. The only evidence that defendant feared that DuPont might shoot him then and there was his testimony that he did not wait to see whether DuPont would pull a gun because, if DuPont had one, defendant would "pretty much lose." However, even this testimony implies that defendant faced neither a probable threat nor a present one. Indeed, it is an admission that defendant launched a deadly preemptive strike against DuPont because he suspected, without any objective basis, that DuPont might be carrying a gun. As a matter of law, that was insufficient even to raise a valid argument that defendant faced a danger that justified the use of deadly force. Thus, the evidence that defendant was guilty of at least second-degree murder was overwhelming.

We also conclude that the evidence that defendant was guilty of first-degree murder, and not merely second-degree murder, was overwhelming. Here, the State did not need to prove anything

beyond the elements of first-degree murder; it was defendant's burden to prove, by a preponderance of the evidence, that he acted out of a subjective belief that circumstances existed that would have justified the use of deadly force against DuPont. See 720 ILCS 5/9--2(a)(2) (West 2002). Much of what we have already said about defendant's claim of self-defense applies to his alternative claim of second-degree murder. The jury had ample evidence to conclude that defendant never feared a threat from DuPont but instead deliberately attacked him by surprise. Even if the jury accepted defendant's assertion that he attacked DuPont out of fear, it would have been required by the applicable law to find that he did not believe in the existence of facts that would have justified the killing. As we have noted, even defendant's own testimony established circumstances that fell far short of justifying the use of deadly force. Of course, whether defendant mistakenly believed that he was legally justified in killing DuPont is irrelevant; the second-degree murder statute requires a defendant to prove his unreasonable belief in circumstances that would have legally justified his acts. See 720 ILCS 5/9--2(a)(2) (West 2002). A defendant's mistaken belief that given facts justify killing is irrelevant. What is required is a mistake of fact, not a mistake of law.

In conclusion, based on the record, there is no clear evidence that the jury saw defendant's shackles. Even if the jury did see defendant's shackles, the evidence against defendant's claim of self-defense and against his claim of second-degree murder was overwhelming. Therefore, under Deck, the State met its burden to prove that any error in shackling him during trial did not contribute to the verdict. Further, trial counsel's failure to object, insist on a hearing, or move for a mistrial worked no prejudice under Strickland. As a result, defendant's petition does not state the gist of a claim that trial counsel was ineffective. Because the shackling was harmless error, appellate

counsel's decision not to raise the issue was neither objectively unreasonable nor prejudicial, and the petition does not state the gist of a meritorious claim that appellate counsel was ineffective. We hold that the trial court did not err in dismissing the petition.

The judgment of the circuit court of Lake County is affirmed.

Affirmed.

BYRNE and CALLUM, JJ., concur.